# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas A. Kelley,
in his capacity as the Trustee of the
PCI Liquidating Trust,

     Plaintiff,

v.

Westford Special Situations Master Fund,
L.P.; Westford Global Asset Management,
Ltd.; Westford Special Situations Fund,
Ltd.; Westford Special Situations Fund,
L.P.; Westford Asset Management, LLC;
Epsilon Global Master Fund, L.P.; Epsilon
Global Active Value Fund, Ltd.; Epsilon
Global Active Value Fund I-B Ltd; Epsilon
Global Active Value Fund, L.P.; Epsilon
Global Master Fund II, L.P., a/k/a Epsilon
Global Master Fund II, L.P., Sub. 1; Epsilon
Global Active Value Fund II-B Ltd.;
Epsilon Global Active Value Fund II-G
Ltd.; Epsilon Global Active Value Fund II,
L.P.; Epsilon Global Active Value Fund II-
B, L.P.; Epsilon Global Active Value Fund
II-G, L.P.; Epsilon Global Asset
Management, Ltd.; Epsilon Investment
Management, LLC; Epsilon Structured
Strategies Master Fund, L.P., f/k/a Epsilon
Global Master Fund III Structured
Strategies, L.P.; Epsilon Global Active
Value Fund III Ltd.; Stafford Towne, Ltd.;
and Steve Goran Stevanovich,

     Defendants.

File No. 19-cv-1073 (ECT/KMM)

**OPINION AND ORDER**

D. Farrington Yates, Igor Margulyan, and Adam Levine, Kobre & Kim LLP, New York, NY; J. David Jackson and Lucas J. Olson, Dorsey & Whitney LLP, Minneapolis, MN, for Plaintiff Douglas A. Kelley.

Sarah Riedl Clark and W. Gregory Lockwood, Gordon Rees Scully Mansukhani, LLP, Chicago, IL/Portland, OR, for Defendants Westford Special Situations Master Fund, L.P., et al.

Plaintiff Douglas A. Kelley, trustee of the Petters Company, Inc. ("PCI") Liquidating Trust, brought this adversary case originally in the Bankruptcy Court for the District of Minnesota seeking to avoid and recover money transfers made to Defendants by PL Ltd., Inc. and Petters Company, Inc., entities controlled by convicted Ponzi-schemer Thomas J. Petters.  For present purposes, Defendants fall into three categories: (1) four master funds that invested over $2 billion in the Petters Ponzi scheme and earned over $300 million in profits as a result (the "Master Funds");[1] (2) the Master Funds' management companies (the "Management Companies");[2] and (3) the lead principal of the Management

---

[1]     The Master Funds are Epsilon Global Master Fund, L.P.; Epsilon Global Master Fund II, L.P.; Westford Special Situations Master Fund, L.P.; and Epsilon Structured Strategies Master Fund, L.P., f/k/a Epsilon Global Master Fund III Structured Strategies, L.P.  Defendants also include eleven "feeder funds," but these feeder funds are not implicated directly by the Parties' motions.  (In a master-feeder structure, investors purchase interests in a feeder fund, and the feeder fund in turn invests its assets in the master fund.  *See*, *e.g.*, *Sec. & Exch. Comm'n v. Conrad*, 354 F. Supp. 3d 1330, 1338–39 (N.D. Ga. 2019).)

[2]     The Management Companies are Westford Global Asset Management, Ltd.; Westford Asset Management, LLC; Epsilon Global Asset Management, Ltd; and Epsilon Investment Management, LLC.

Companies at the time of the Master Funds' investments in the Petters Ponzi scheme, Steve Goran Stevanovich.

Kelley on the one side, and the Management Companies and Stevanovich on the other, have filed competing motions for summary judgment. Kelley has moved for partial summary judgment on his actual and constructive fraud claims against the Master Funds. Kelley's summary-judgment motion relies on *Kelley v. Kanios*, 383 F. Supp. 3d 852 (D. Minn. 2019), a decision that entered summary judgment in favor of Kelley on equivalent claims under like circumstances. The judgment entered in *Kanios* was appealed to the Eighth Circuit, and oral argument occurred on February 11, 2020. Because the Eighth Circuit's decision in Kanios (whichever way it comes out) is certain to be significant here, it makes sound practical sense to delay deciding Kelley's motion until the Eighth Circuit decides *Kanios*. The Management Companies and Stevanovich also seek summary judgment, arguing essentially that Kelley cannot show that they received property, either directly or as subsequent transferees, from any Petters-affiliated entity. This motion will be denied because Kelley has introduced materials—an expert report and associated documents—from which a juror reasonably may infer that the Management Companies and Stevanovich are subsequent transferees of property that originated with the Debtor.

I

Petters owned numerous businesses, including Petters Group Worldwide LLC, Sun Country Airlines, Polaroid Corporation, Fingerhut, and PCI; through PCI, Petters perpetrated a multi-billion-dollar Ponzi scheme. *United States v. Petters*, 663 F.3d 375, 379 (8th Cir. 2011). Petters "induced investments in fake consumer electronics financing

transactions and paid 'returns' to investors using the investors' own money or other subsequent investors' money."  Second Am. Compl. ¶¶ 1, 67–68 [ECF No. 7-10]; *see also Petters*, 663 F.3d at 379.

From 2001 to 2007, the Master Funds invested nearly $2.5 billion with Petters through approximately 346 loans, each evidenced by a promissory note.  Clark Decl., Ex. B ("Murray Report") ¶ 40 [ECF No. 46-2]; *see* Second Am. Compl. ¶¶ 73–79.  In all but one circumstance in which PCI was the borrower, the loans were made to PL Ltd., a special-purpose entity established by Petters to receive loan proceeds from the Master Funds.  Second Am. Compl. ¶¶ 70–72, 100–13.  PL Ltd. transferred loan proceeds to "vendors" controlled by Petters' associates, and the vendors "pretended to sell receivables or inventory to PCI," creating fraudulent paperwork showing non-existent transactions.  *Id.* ¶¶ 80–97.  Petters and his associates would then create fraudulent purchase orders and invoices showing fictitious profits from the "resale" of that inventory to "big-box" retailers like Costco and Sam's Club.  *Id.* ¶¶ 87, 96.  When a note matured, PCI would transfer funds, typically funds received from other investors in an amount greater than the original principal and interest specified in the promissory note, back to the PL Ltd. account, from which Stevanovich could withdraw the principal and interest owed to the Master Funds. *Id.* ¶¶ 85–86, 88.  Unlike many other Petters investors, the Master Funds ultimately were repaid all outstanding principal balances, interest, and origination fees before the Petters scheme collapsed.  Murray Report ¶ 49; *see* Second Am. Compl. ¶¶ 2–4, 70–73.  These payments totaled nearly $2.8 billion, including $318,187,782 in profits to the Master

Funds.  Murray Report ¶¶ 49–50; *see* Second Am. Compl. ¶¶ 2–4, 73.  (Kelley refers to these as "false profits."  Pl. Mem. in Opp'n at 5 [ECF No. 57].)

During the period the Master Funds invested in the Petters entities, the Master Funds "received cash from various sources, including returns from hundreds of investments unrelated to [] Petters, proceeds from the sales of those investments, and payments from PL Ltd., Inc."  Stevanovich Decl. ¶ 5 [ECF No. 47].  The Master "Funds also received cash from new investors" during this period.  *Id.*  All funds from all sources were deposited in a single account for each Master Fund.  *Id.* ¶ 7.  The Master Funds "applied money received from all sources, including PL Ltd., Inc. and hundreds of other investments, to invest in other holdings, pay expenses, or credit redeeming investors."  *Id.* ¶ 8.  The Master Funds also applied these funds to pay "management fees" (paid quarterly) and "performance fees" (paid annually and when a redemption was issued to an investor) to the Management Companies.  *Id.* ¶ 9; Murray Report ¶¶ 141–43.  The Management Companies received fees from the Master Funds and from other "master funds unrelated to this action and which never lent money to [] Petters or his entities."  Stevanovich Decl. ¶ 10.  "[T]he Management Companies also received consulting fees and miscellaneous fees from specialty funds and consulting projects unrelated to [] Petters or his companies."  *Id.* ¶ 11.  "The Management Companies deposited all fees received from all sources in a single account for each Management Company."  *Id.* ¶ 12.  "In turn, the Management Companies applied the fees received to pay office rent for multiple locations, employee payroll, compensation for [] Stevanovich, and general business expenses."  *Id.* ¶ 13.  Neither the Management

5

Companies nor Stevanovich personally loaned funds or invested in Petters or his entities. *Id.* ¶¶ 4, 14.

In October 2008—following the collapse of the Petters Ponzi scheme—PCI and PL Ltd., along with other PCI affiliates, filed voluntary petitions for relief in bankruptcy court under Chapter 11 of the Bankruptcy Code. *See* Compl. ¶¶ 40–42 [ECF No. 1-1]. In February 2009, the bankruptcy court appointed Kelley trustee of the PCI Liquidating Trust for all debtors. Def. Summ. J. Mot. ¶ 1 [ECF No. 43]. In October 2010, Kelley commenced this adversary case in bankruptcy court pursuant to the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 7001, and the Minnesota Uniform Fraudulent Transfer Act ("MUFTA"),[3] seeking to avoid and recover transfers made by PCI and PL Ltd. to Defendants, "including the payments of both principal and false profits in excess of their investments." Second Am. Compl. ¶ 6–7; *see* Compl. The Parties then engaged in discovery and motion practice for several years.

On June 26, 2017, Kelley filed his second amended complaint, which is the operative complaint in this case.[4] After discovery closed, the Management Companies and

---

[3]     MUFTA was renamed the Minnesota Uniform Voidable Transactions Act in 2015, *see* Minn. Stat. § 513.51, but the Parties agree that amendments made at that time are not material to their motions, and they use the acronym MUFTA to conform with earlier pleadings and case law, *see* Pl. Mem. in Supp. at 2 n.2 [ECF No. 50].

[4]     Kelley asserts eleven claims in the second amended complaint: (I) Fraudulently Incurred Obligations – Actual Fraud, 11 U.S.C. § 548(a)(1)(A); (II) Fraudulently Incurred Obligations – Actual Fraud, 11 U.S.C. §§ 544(a) and (b), Minn. Stat. §§ 513.44(a)(1) and 513.47; (III) Actual Fraudulent Transfers – Actual Fraud, 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551 (Regarding Two-Year Transfers); (IV) Constructive Fraudulent Transfers – Constructive Fraud, 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551 (Regarding Two-Year Transfers); (V) Actual Fraudulent Transfers – Actual Fraud, 11 U.S.C. §§ 544(a) and (b),

Stevanovich moved in the Bankruptcy Court for summary judgment on all claims against them.  ECF No. 7-40.  They argued, in part, that the fraudulent transfer claims against them failed because Kelley had not, as a matter of law, traced transfers from PCI and PL Ltd. to them.  *Id.* at 7.  In a March 13, 2019 order, Bankruptcy Judge Kathleen H. Sanberg denied the motion as to counts I through VIII of the second amended complaint, reasoning that the motion raised a genuine issue of material fact as to the tracing methodologies and conclusions of Kelley's expert, Marti P. Murray.  Summ. J. Order ¶ 2 [ECF No. 8-4]; *see* Summ. J. Tr. at 18–25 [ECF No. 17-1].  Judge Sanberg granted the motion as to count XI.  Summ. J. Order ¶ 4.  Judge Sanberg also ordered Kelley, the Management Companies, and Stevanovich to file a stipulation effecting their agreement to the voluntary dismissal of counts IX and X.  *Id.* ¶ 3.  No stipulation to that effect has been filed, however.  *See* Def. Mem. in Supp. at 9 n.9 [ECF No. 45].  This case subsequently was transferred to this Court.

---

550(a), 551, Minn. Stat. §§ 513.44(a)(1) and 513.47 (For avoidance and recovery, as initial transferees of the PCI Direct Transfers and PL Ltd. Transfers, and as subsequent transferees of the PCI SPE Transfers); (VI) Constructive Fraudulent Transfers – Constructive Fraud, 11 U.S.C. §§ 544(a) and (b), 550(a), 551, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 (For avoidance and recovery, as initial transferees of the PCI Direct Transfers and PL Ltd. Transfers, and as subsequent transferees of the PCI SPE Transfers); (VII) Fraudulent Transfers – Constructive Fraud, 11 U.S.C. §§ 544(a) and (b), 550(a), 551, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 (For avoidance and recovery, as initial transferees of the PCI Direct Transfers and PL Ltd. Transfers, and as subsequent transferees of the PCI SPE Transfers); (VIII) Fraudulent Transfers – Constructive Fraud, 11 U.S.C. §§ 544(b), 550(a), 551, Minn. Stat. §§ 513.45(a) and 513.47 (For avoidance and recovery, as initial transferees of the PCI Direct Transfers and PL Ltd. Transfers, and as subsequent transferees of the PCI SPE Transfers); (IX) Lien Avoidance – 11 U.S.C. § 506(d); (X) Turnover and Accounting – 11 U.S.C. § 542; and (XI) Unjust Enrichment/Equitable Disgorgement.

ECF No. 1.  The Management Companies and Stevanovich have moved for summary judgment on all remaining claims.  Def. Summ. J. Mot.

## II

The Parties dispute whether the Bankruptcy Court's order on the Management Companies and Stevanovich's previous summary-judgment motion bars consideration of this motion because the Bankruptcy Court's order is law of the case.  Pl. Mem. in Opp'n at 15–16 [ECF No. 57]; Def. Reply Mem. at 8–9 [ECF No. 61].  It is not.  The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Morris v. Am. Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir. 1993) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  The doctrine applies to final decisions by a district court that have not been appealed, but it does not apply to interlocutory orders, "for they can always be reconsidered and modified by a district court prior to entry of a final judgment."  *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir. 2007) (quoting *United States v. Hively*, 437 F.3d 752, 766 (8th Cir. 2006)).  A district court's denial of summary judgment as to some claims in a case "renders the entire order interlocutory" because it necessarily indicates that there are claims left to be resolved.  *Acton v. City of Columbia*, 436 F.3d 969, 973 (8th Cir. 2006).  The Eighth Circuit has expressly rejected the argument that "the law of the case doctrine precludes a second summary judgment motion unless it can be shown that the second or renewed motion is based upon substantial discovery of facts not before the court at the time of the original motion."  *Mosley v. City of Northwoods*, 415 F.3d 908, 911 (8th Cir. 2005) (stating the law of the case doctrine

"does not deprive the district court of the ability to reconsider earlier rulings to avoid reversal" (citation and internal quotation marks omitted)). Therefore, the law of the case doctrine does not bar consideration of the Management Companies and Stevanovich's present summary-judgment motion.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.[5]

---

[5]     Kelley argues that, "[i]rrespective of whether the Moving Defendants meet their summary judgment burden, this Court may still deny summary judgment in its discretion if it believes that the better course would be to proceed to a full trial." Mem. in Opp'n at 14, n.7. As support for this argument, Kelley cites *McLain v. Meier*, in which our Eighth Circuit Court of Appeals some 41 years ago observed:

> [A] district court in passing on a Rule 56 motion performs what amounts to what may be called a negative discretionary function. The court has no discretion to *grant* a motion for summary judgment, but even if the court is convinced that the moving party is entitled to such a judgment the exercise of sound judicial discretion may dictate that the motion should be *denied*, and the case fully developed.

612 F.2d 349, 356 (8th Cir. 1979). This description of the law seems difficult to square with the current version of Rule 56. It says that a district court "*shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis

The law allows bankruptcy trustees to recover the value of avoided property transfers, not merely from initial transferees, but from subsequent transferees also. Under the Bankruptcy Code, the avoidance of transfers (pursuant to specified Code provisions at issue in this case) would allow the Trustee to recover "the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). Similarly, under Minnesota law, "the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less" against "(i) the first transferee of the asset or the person for whose benefit the transfer was made; or (ii) an immediate or mediate transferee of the first transferee, other than[] (A) a good-faith transferee that took for value[] or (B) an immediate or mediate good-faith transferee of a person described in subitem (A)." Minn. Stat. § 513.48(b)(1). Here, because there appears to be no fact dispute that the Management Companies and Stevanovich did not themselves invest in, or receive payments from, PCI or PL Ltd., Kelley must establish that they were subsequent transferees of amounts that the Master Funds received from PCI or PL Ltd. And Kelley seeks to do precisely that. He alleges that the Management Companies received at least $60,667,405

---

added). It also seems irreconcilable with the Supreme Court's 1986 summary-judgment trilogy that made clear, among other things, that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson*, 477 U.S. 242.

in management fees and performance fees based on amounts the Master Funds received from PCI or PL Ltd. and that amounts Stevanovich received from the Management Companies also were based on these amounts. Pl. Mem. in Opp'n at 10–13; *see* Murray Report ¶¶ 138–83.

The Management Companies and Stevanovich seek summary judgment on all remaining claims against them on the ground that Kelley cannot, as a matter of law, meet his burden to show the transfer of funds from PCI and PL Ltd. to them. Def. Summ. J. Mot. ¶ 2; Def. Mem. in Supp. at 1–3. To summarize, the Management Companies and Stevanovich argue that Kelley cannot meet his tracing burden because of the extensive commingling of receipts by the Master Funds and the Management Companies. *See* Def. Mot. ¶ 3; Def. Mem. in Supp. at 15–22. They note that the Master Funds "received investment returns from numerous investment positions (only one of which was PL Ltd., Inc.), proceeds from sales of investment positions, and infusions of cash from new subscribing investors, which they deposited in a single account" for each Master Fund. Def. Mem. in Supp. at 19. The Master Funds then "reinvested the proceeds in other positions and redeemed investor interests before paying management and performance fees." *Id.* The management and performance fees were paid "on the basis of all assets under management as of a particular date or the yearly increase in the global net asset value," and the Management Companies deposited those fees in the same account as they received fees from other sources and used money from those accounts to pay expenses beyond the distributions to Stevanovich. *Id.* at 20; Stevanovich Decl. ¶ 12–13. Therefore, the Management Companies and Stevanovich argue, "[t]he nature of both the receipt of

11

funds from multiple investments and the method of calculating the management and performance fees prevents the Trustee from establishing that any money . . . originated solely with PL Ltd." Def. Mem. in Supp. at 20.

The law does not place such a difficult burden on trustees. The commingling of legitimate funds with funds transferred from a debtor does not defeat tracing. *In re Dreier LLP*, No. 08-15051 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014); *In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (BRL), 2012 WL 892514, at *2 (Bankr. S.D.N.Y. Mar. 14, 2012) (rejecting the "untenable assumption that once the [f]ictitious [p]rofits were comingled with legitimate funds" none of the funds could be traced). A trustee's burden "is not so onerous as to require dollar-for-dollar accounting of the exact funds at issue." *Madoff*, 2012 WL 892514, at *3 (citation and internal quotation marks omitted); *see Dreier*, 2014 WL 47774, at *15 (denying Management Companies' motion for summary judgment, reasoning evidence that the debtor contributed to the managed funds' profits, which triggered the funds' obligation to pay fees to the Management Companies, supported a reasonable inference that those fees were actually paid absent evidence to the contrary); *see also In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 708 (11th Cir. 2005) ("[P]roper tracing does not require dollar-for-dollar accounting."). Factual allegations that "show the relevant pathways through which the funds were transferred" are sufficient. *Madoff*, 2012 WL 892514, at *3.

Relying on *Weil v. United States*, the Management Companies and Stevanovich argue that, in lieu of dollar-for-dollar tracing, Kelley must show that management and performance fees received by the Management Companies and money received by

Stevanovich "originated solely" with PCI and PL Ltd. to defeat summary judgment.  Def.

Mem. in Supp. at 17–21.  *Weil* did not establish that rule.  True, in distinguishing its facts

from those in *International Administrative*, *Weil* observed that the transfers in *International*

*Administrative* were shown to have "originated solely" from the debtor while the *Weil*

trustee had not made a similar showing.  *Weil v. United States*, No. 1:09-bk-26982-VK,

2016 WL 1239519, at *17, 27 (Bankr. C.D. Cal. Mar. 29, 2016), *report and*

*recommendation adopted sub nom.*, *In re Tag Entm't Corp*, 2016 WL 5947304 (C.D. Cal.

Oct. 5, 2016).  But *Weil* nowhere adopts or applies a rule that transfers must be shown to

have "originated solely" with the debtor to be recoverable.  Instead, *Weil* applied the rule

that "attenuated links between the debtor and the ultimate transferee" are insufficient to

establish a transfer of assets.  *Weil*, 2016 WL 1239519, at *17, 27; *see Kremen v. Cohen*,

No. 5-11-CV-05411-LHK, 2012 WL 2919332, at *5 (N.D. Cal. July 17, 2012).  *Weil* also

involved a materially different procedural posture and facts.  In *Weil*, the trustee sought to

show in a bench trial that the United States received a transfer from the debtor corporation

(TAG Entertainment Corp.), when it received a restitution payment from an individual

(Austin) who had been convicted of mail fraud and filing a false tax return.  *Weil*, 2016

WL 1239519, at *2.  Austin incorporated TAG Entertainment and was involved in its

management at various times, but Austin's convictions arose from his activities in

connection with another business organization.  *Id.* at *7.  To meet her tracing burden, the

trustee "pointed to several real estate transactions, the last of which was the sale of [real

property] for the purpose of meeting Mr. Austin's restitution obligation."  *Id.* at *2.  The

trustee tried to show that TAG Entertainment "was the originating source of funding for

these real estate transactions." *Id.* Following trial, the court found that the trustee had not established a sufficient connection between Austin and his acquisition of the real estate he sold to pay his restitution obligation and payments from TAG Entertainment. *Id.* at **22–27. The trustee, the court explained, had identified irregularities, but failed to present evidence of a pathway of funds or sufficient circumstantial evidence to connect payments from the debtor to Austin's purchase of the real property he eventually sold to pay his restitution obligation. *Id.* Here, in contrast to *Weil*, there is a summary-judgment motion (not a trial), and the asserted pathway of funds is more direct.

Kelley has introduced materials—Murray's expert report and its associated documents—from which a juror reasonably may infer that the Management Companies and Stevanovich are subsequent transferees of property that originated with the Debtor. Two of Murray's opinions and accompanying analysis are particularly relevant to this motion. In her fourth opinion, Murray concluded that the Management Companies received at least $60,667,405 in management fees and performance fees based on the $318,187,782 in profits received by the Master Funds from their Petters investments. Murray Report ¶¶ 138–62. (For convenience, profits from the Master Funds' Petters investments will be referred to from here on as "Petters profits.") To reach this conclusion, Murray first determined the amount of overall profits received yearly by each Master Fund during the Petters Ponzi scheme and the amount in management and performance fees paid to the Management Companies during that time. *Id.* ¶¶ 138–43. Murray then calculated the minimum amount of management fees attributable to Petters profits by identifying Petters profits by Master Fund by quarter and then determining what management fees

were charged on those Petters profits by quarter based on each fund's management fee rate. *Id.* ¶¶ 144–58, App'x K. Murray then calculated the amount of performance fees attributable to Petters profits by subtracting the management fees charged during each year from Petters profits earned during that year and multiplying the result by the performance fee rate. *Id.* ¶¶ 159–61, App'x K. In her fifth opinion, Murray concluded that Stevanovich received cash payments from the Management Companies "well in excess" of the $60,667,405 in fees received by the Management Companies attributable to Petters profits. *Id.* ¶¶ 163–83. To reach this conclusion, Murray first determined the amount in fees attributable to Petters profits paid to each of the Management Companies, two of which are domestic entities and two of which are offshore entities. *Id.* ¶¶ 163–78. Murray then observed that the two domestic Management Companies are owned entirely by Stevanovich through "Ally Kat," an entity Stevanovich established in 2001, and that Stevanovich received "virtually the same amount in distributions [from Ally Kat] in the years 2004 to 2007 as the fees credited to the domestic Stevanovich Entities relating to [Petters] Profits in all the years in which there were [Petters] Profits." *Id.* ¶¶ 164–65. Murray further observed that the net income from the two offshore Management Companies was "virtually the same as gross income, meaning [they] did not have material expenses" and that the fees received by those companies relating to Petters profits "would have directly benefitted Stevanovich without material deductions." *Id.* ¶ 168. Murray determined that Epsilon Global Asset Management's account showed teller withdrawals totaling $49,812,709 during the relevant time period and that Stevanovich had "sole signatory authority" for the account, making it "reasonable to conclude that Stevanovich

received these funds. *Id.* ¶¶ 170–73. Similar documentation was not available for Westford Global Asset Management's account, "including documentation relating to signatory authority on the account," but Murray determined there were teller withdrawals from that account during the relevant timeframe totaling $51,480,519 and posited that it was reasonable to conclude that Stevanovich also had sole signatory authority over the account and received those funds. *Id.* ¶ 174–78.

The Management Companies and Stevanovich argue that Murray's investigation, analysis, and opinions cannot be relied on to identify genuine issues of material fact because Murray "utterly fails to identify any accepted methodology for the critical portion of her opinion at which she purportedly connects PL Ltd., Inc's payments to the Management Companies (and, ultimately, Mr. Stevanovich)." Mem. in Supp. at 23. Whether Murray's methodology is "accepted" is more properly considered under Federal Rule of Evidence 702 and the rubric of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Management Companies and Stevanovich did not challenge Murray's opinions on this basis. Stevanovich argues that, if Kelley were able to trace funds from PCI and PL Ltd. to him, the distributions he received were compensation for his management services and are not subject to claw back under 11 U.S.C. § 550(a)(2). Def. Mem. in Supp. at 29–31. For this position, Stevanovich cites authorities establishing that a corporate officer's receipt of salary from a debtor or transferee corporation is alone insufficient to render the officer a transferee. *See In re Geltzer*, 502 B.R. 760, 772–73 (Bankr. S.D.N.Y. 2013) (citing *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp.2d 209, 227 (S.D.N.Y. 2004)). Here, there is a fact dispute about whether the distributions

Stevanovich received from the Management Companies were a salary in light of Stevanovich's deposition testimony that he is not an employee of his entities and that his distributions were comprised of the funds that remained after the Management Companies paid their expenses. *See* Yates Decl, Ex. J at 27:7–29:9; 34:10–12; 51:12–18 [ECF No. 58-1 at 228–30, 234].

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants Westford Global Asset Management, Ltd., Westford Asset Management, LLC, Epsilon Global Asset Management, Ltd., Epsilon Investment Management, LLC, and Steve Goran Stevanovich's Motion for Summary Judgment [ECF No. 43] is **DENIED**.


Dated:  June 10, 2020                                   s/ Eric C. Tostrud
                                                        Eric C. Tostrud
                                                        United States District Court