# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Douglas A. Kelley, in his capacity as Trustee of the PCI Liquidating Trust, | No. 19-cv-1073 (KMM/JFD) |
| Plaintiff, | |
| v. | |
| Westford Special Situations Master Fund, L.P.; Westford Global Asset Management, Ltd.; Westford Special Situations Fund, Ltd.; Westford Special Situations Fund, L.P.; Westford Asset Management, LLC; Epsilon Global Master Fund, L.P.; Epsilon Global Active Value Fund, Ltd.; Epsilon Global Active Value Fund I-B Ltd.; Epsilon Global Active Value Fund, L.P.; Epsilon Global Master Fund II, L.P. a/k/a Epsilon Global Master Fund II, L.P., Sub 1; Epsilon Global Active Value Fund II, Ltd., f/k/a Westford Investment Fund Ltd.; Epsilon Global Active Value Fund II-B Ltd.; Epsilon Global Active Value Fund II-G Ltd.; Epsilon Global Active Value Fund II, L.P.; Epsilon Global Active Value Fund II-B, L.P.; Epsilon Global Active Value Fund II-G, L.P.; Epsilon Global Asset Management, Ltd.; Epsilon Investment Management, LLC; Epsilon Structured Strategies Master Fund, L.P., f/k/a Epsilon Global Master Fund III – Structured Strategies, L.P.; Epsilon Global Active Value Fund III Ltd.; Stafford Towne, Ltd.; and Steve Goran Stevanovich; | |
| Defendants. | |

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND MEMORANDUM OF DECISION**

---

## I.    INTRODUCTION

This case arises from the massive Ponzi scheme perpetrated by Thomas Petters between 1994 and 2008 through Petters Company, Inc. ("PCI"). Petters and his associates purported to operate a "diverting" business that purchased consumer goods at low prices and resold them at significant profit to big box retailers, but "[i]n reality, PCI engaged in almost no purchase and sale transactions." *Kelley v. Boosalis*, 974 F.3d 884, 887 (8th Cir. 2020). To finance those fictitious deals, PCI sought investment from lenders to whom Petters and PCI offered high interest rates. Petters and his associates also attached fabricated purchase orders to promissory notes issued to lenders to signal the legitimacy of the transactions. When it was able, PCI paid back lenders their principal and the agreed interest, but because the transactions were a sham, the funds weren't generated from profit generated by the sale of goods at markup to the retailers. Instead, Petters was paying off early lenders with their own funds and the funds he obtained from new "investors" that were defrauded into lending money into the same scheme.

Eventually the scheme came crashing down when one of Petters's associates, Deanna Coleman, walked into the U.S. Attorney's Office in Minneapolis and exposed the years-long fraud. As often happens in a Ponzi scheme, many of those who loaned money to the Petters scheme early on were able to recoup their original investment and realize a profit, but those who made loans to PCI toward the end of the scheme lost everything.

Petters was convicted of 20 counts of fraud. PCI was placed in receivership, and in October 2008, it declared bankruptcy.

The Plaintiff in this case, Douglas A. Kelley, is the liquidating Trustee for the PCI Liquidating Trust ("Plaintiff" or the "Trustee"). For years, the Trustee has engaged in litigation in efforts to recover funds for distribution to PCI's unfortunate creditors. The Defendants in this case include several related master hedge funds and feeder funds, investment management companies, and Defendant Steve Goran Stevanovich, who is now *pro se*. The Trustee brought this case in October 2010 as an adversary proceeding in the United States Bankruptcy Court for the District of Minnesota. The Second Amended Complaint, which is now the operative pleading, includes claims under the Bankruptcy Code and Minnesota's Uniform Fraudulent Transfer Act ("MUFTA").[1] The Trustee seeks to avoid and recover money transfers to Defendants by PCI and PL Ltd., a Petters company that transacted with Defendants.[2]

On September 19, 2023, the Trustee for the PCI Liquidating Trust ("Plaintiff" or "the Trustee"), executed a stipulation with the Corporate Defendants and *pro se* Defendant Steve Goran Stevanovich waiving their rights to a jury trial and agreeing to try their case based on a paper record and trial briefs. Trial Stip. ¶¶ 6–9 (Doc. 232). The parties agreed that the Court's decision granting in part and denying in part the Trustee's motion regarding

---

[1] The Minnesota Legislature renamed MUFTA the Minnesota Uniform Voidable Transactions Act in 2015, *see* Minn. Stat. § 513.51, but the parties agree that the amendments to the statute are not pertinent to their dispute, and they use the acronym MUFTA to conform to earlier pleadings and case law.

[2] PL Ltd. is a special purpose entity ("SPE") established by Petters for the purpose of receiving loaned funds from the Defendants.

"law of the case" had significantly narrowed the disputed issues in this case.[3] *Id.* ¶ 3. As

stipulated by the parties:

> Specifically, the Parties agree that only three issues remain for trial. The first two issues concern Defendants' affirmative defense of "good faith," which requires Defendants to prove that they received transfers from the Ponzi scheme in "[1] in good faith and [2] for a reasonably equivalent value." Minn. Stat. § 513.48(a); see also 11 U.S.C. § 548(c); 11 U.S.C. § 550(b). The third issue is "tracing"—whether the Trustee can prove that Defendants received transfers from the Ponzi scheme.

*Id.* ¶ 4.[4]

In accordance with Federal Rule of Civil Procedure 52(a), and after reviewing the

entire trial record, the Court makes the findings of fact and conclusions of law set out

below. Three preliminary points apply throughout the following decision. First, all findings

of fact in this case are made subject to the preponderance-of-the-evidence standard.

Second, while the Plaintiffs bear the burden of proof on the elements of their claims under

the Bankruptcy Code and MUFTA, the Defendants bear the burden of proof on their

affirmative defenses, including the obligation to demonstrate that the at-issue transfers

were made "in good faith" and for "reasonably equivalent value." And third, "[t]o the

---

[3] The Court issued a brief written Order (Doc. 127) memorializing its ruling on the Trustee's "Motion on Law of the Case" (Doc. 98). The Court explained its reasoning at length from the bench during a September 9, 2022 hearing on the Trustee's motion. 9/9/22 Tr. (Doc. 131). Defendants have reserved any rights they may have to challenge the Court's decision on that motion. Trial Stip. ¶ 3.

[4] The parties noted that Defendants are asserting an affirmative defense under 11 U.S.C. § 546(e), which prohibits a trustee from avoiding a payment "that is a margin payment" or a "settlement payment" that is made to a commodities broker, financial institution, and others, or transfers that are made by certain persons in connection with a securities contract.

extent any findings of fact have been designated in error as conclusions of law they should

be deemed findings of fact and any conclusions of law designated in error as findings of

fact shall be deemed conclusions of law." *Ridings v. Maurice*, 444 F. Supp. 3d 973, 981 n.5

(W.D. Mo. 2020) (cleaned up).

## FINDINGS OF FACT

### I.    The Petters Scheme

1. Between 1994 and 2008, Tom Petters ("Petters") operated a multi-billion Ponzi

scheme.[5] Trustee's Am. Statement of Facts-1 ("TSF-00X") (Doc. 278).[6]

---

[5] The Bankruptcy Court aptly described the term "Ponzi scheme" as follows:

> A Ponzi scheme is a species of fraudulent operation in which third
> parties are inducted to invest with or lend to the purveyor on the
> representation that their infusions will go into specific transactions,
> enterprises, or other investment vehicles that will generate a high
> return. (Often there is an accompanying representation of limited or
> no risk.) In actuality, the purveyor repays earlier investors or lenders
> with money from infusions made by a larger group of later investors
> or lenders. There is rarely, or never, any use of the funds toward the
> purposes represented. The shuffle of money is also directed in part
> to the purveyor's personal uses, often to maintain inflated personal
> consumption or to keep up the physical façade of a legitimate and
> successful business operation. The phenomenon is named after
> Charles Ponzi, a 1920s-era purveyor whose scheme collapsed into a
> bankruptcy proceeding. One of the controversies in the bankruptcy
> court made it to the United States Supreme Court, *Cunningham v.
> Brown*, 265 U.S. 1 (1924).

*In re Petters Co., Inc.*, 506 B.R. 787, 790 n.7 (Bankr. D. Minn. 2013) ("Substantive Consol.
Order").

[6] The Trustee submitted a Statement of Facts (Doc. 257), and an Amended Statement of Facts
(Doc. 278). The Court cites to the latter in this Order. Included in the Trustee's Amended Statement
of Facts are citations to the portions of the record on which the Trustee relies to support each
assertion of fact. Where the Court finds that the cited portions of the record fully support the
Trustee's proposed finding, the Court cites to the Trustee's statement of fact itself. Where
appropriate, the Court will cite directly to portions of the record.

2. Petters purported to run a "diverting" business through PCI, purchasing consumer goods and reselling them at markup. TSF-2.

3. In reality, there was almost no merchandise, and the ostensible business and its transactional structure were all a façade. The money coming into PCI was from loans and investments, which were themselves fraudulently induced and used to repay earlier investors. Petters operated the fraud by tricking people into lending money and then funneling that new money to repay old debts while falsely claiming the new money came from the profits of the non-existent business venture. TSF-3–5.

4. Petters and Deanna Coleman ("Coleman"), PCI's Vice President of Operations, solicited short-term loans, purportedly to finance merchandise transactions from "big box" retailers like BJ's and Costco ("Retail Customers"). Stip. as to Undisputed Facts-1 ("UF-X") (Doc. 237); TSF-9.

5. The purported transactions involved obtaining merchandise from "Vendors." The Vendors involved were Nationwide International Resources, Inc. ("Nationwide"), and Enchanted Family Buying Company ("Enchanted"). Nationwide and Enchanted purported to buy merchandise that would be re-sold to the Retailer-customers. TSF-6.

6. Coleman or Petters would contact potential investors and tell them Petters had a deal with a Retail-Customer, and needed payment from the investor to complete the transaction. UF-2.

7. Coleman would then falsify the purchase orders from PCI for the transaction to Nationwide or Enchanted based on pricing from publicly available advertisements for

actual retailers. UF-3. Petters and a third member of PCI, Bob White, also participated in the creation of fake purchase orders. TSF-11.

8. To obtain loaned funds from investors, Petters used special purpose entities ("SPE"). TSF-16–17.

9. There was substantial identity between PCT and the SPEs, including: (1) a high degree of structural and de facto operational interrelatedness, (2) the SPEs' governance had no independence from PCI; (3) a failure to observe functional, transaction-specific boundaries, (4) a unity of equity interests and ownership, and (5) commingling of assets and business functions. TSF-19.

10. PCI or Petters owned and controlled each SPE. TSF-18, TSF-20. The SPEs were not managed independently from PCI, did not convene meetings of their own boards of directors, and they did not have their own office space, phone lines, employees, fax lines, or email addresses. TSF-20. The SPEs' ostensible business and transactional structure were virtually all a façade, they did not engage in business transactions with third parties independently from PCI, and they conducted no legitimate and non-collusive business activity to generate revenue. TSF 21.

11. PCI paid the SPEs' costs and expenses and would transfer any excess back to PCI. TSF-24.

12. Through the SPEs, Petters presented fictitious transactions to lenders, the lenders transferred a loan to the SPEs' bank accounts, and the SPEs then executed promissory notes in favor of the lenders. TSF-25. Each loan was memorialized with a

promissory note stating the principal amount, term (often 60 days), and interest to be paid upon maturity. UF-4.

13. The SPE transferred the funds out of the SPE's bank account, ending up in PCI's bank account at M&I Bank. TSF-26. PCI then transferred funds from the M&I account back to the SPE's account, ostensibly having completed the sale to the retailer. TSF-27. The SPE used the funds it received from PCI to pay off the principal and interest owed to the lender pursuant to the promissory note. TSF-28.

14. PCI (including all the SPEs) had actual intent to hinder, delay, or defraud its creditors. TSF-30.

15. PCI was insolvent at all relevant times from 1996 until the end of the Ponzi scheme in 2008. TSF-34.

16. In September 2008, Coleman disclosed the fraud to federal authorities. UF-6.

17. A jury convicted Petters of 20 counts of fraud, and the court sentenced him to 50 years in prison. UF-7. For their involvement in the Petters Ponzi scheme, Coleman and White both pled guilty to federal crimes and were sentenced to prison terms. TSF-37–38. The principals of Nationwide and Enchanted pled guilty to conspiring to commit money laundering and were sentenced to prison terms. TSF-40.

18. Judge Ann Montgomery placed PCI into receivership, and PCI then declared bankruptcy on October 11, 2008. UF-8.

## II.    The Parties

19. Plaintiff Douglas A. Kelley is the Trustee of the PCI Liquidating Trust.

20. Defendants include a group of Corporate Defendants and individual Defendant Steve Goran Stevanovich ("Stevanovich").[7]

21. Stevanovich is a highly sophisticated fund manager and investor. UF-29. He has an undergraduate degree and MBA from the University of Chicago. UF-30. After receiving his MBA, Stevanovich began working at Berkeley, in a post-MBA-type training program. UF-31. Stevanovich then worked for Ingoldsby O'Connor Atwell and Co., an investment banking firm, for about one year. UF-32. Stevanovich then moved to Everest Capital, where he worked for five and a half years. UF-33. Stevanovich has experience with credit analysis, lending, corporate finance, general investing globally, investment banking, mergers, and acquisitions. UF-34. In 1997, Stevanovich started his own firm, one of the Defendant hedge funds. TSF-101.

22. The Corporate Defendants include the following twenty hedge fund entities:

    a.  Westford Special Situations Master Fund, L.P.;
    b.  Westford Global Asset Management, Ltd.;
    c.  Westford Special Situations Fund, Ltd.;
    d.  Westford Special Situations Fund, L.P.;
    e.  Westford Asset Management, LLC;
    f.  Epsilon Global Master Fund, L.P.;
    g.  Epsilon Global Active Value Fund, Ltd.;
    h.  Epsilon Global Active Value Fund I-B Ltd.;
    i.  Epsilon Global Active Value Fund, L.P.;
    j.  Epsilon Global Master Fund II, L.P. a/k/a Epsilon Global Master Fund II, L.P., Sub 1;
    k.  Epsilon Global Active Value Fund II, Ltd., f/k/a Westford Investment Fund Ltd.;
    l.  Epsilon Global Active Value Fund II-B Ltd.;
    m.  Epsilon Global Active Value Fund II-G Ltd.;
    n.  Epsilon Global Active Value Fund II, L.P.;

---

[7] In citations to declarations and other testimony provided by Mr. Stevanovich, the Court uses the abbreviation "SGS."

o.  Epsilon Global Active Value Fund II-B, L.P.;
p.  Epsilon Global Active Value Fund II-G, L.P.;
q.  Epsilon Global Asset Management, Ltd.;
r.  Epsilon Investment Management, LLC;
s.  Epsilon Structured Strategies Master Fund, L.P., f/k/a Epsilon Global Master Fund III – Structured Strategies, L.P.; and
t.  Epsilon Global Active Value Fund III Ltd.; Stafford Towne, Ltd.

23. The Corporate Defendants are organized into four "master-feeder" fund structures, UF-9, and they also include four "Management Companies," UF-20. A Master-Feeder Fund structure is typical among hedge funds. It is usually set up to accommodate the various needs and tax attributes of different groups of investors, such as those located in the United States and outside of the country. UF-10.

24. Under the fund structure, individuals and other entities invest in feeder funds, which may be tailored to accommodate the needs and goals of particular investors. UF-11. In turn, the feeder funds invest in master funds. UF-12. The master funds would then make the investments, pursuant to guidance from management companies. UF-13.

25. Four Defendants are master funds (the "Master Funds"): Epsilon Global Master Fund L.P., Epsilon Global Master Fund II L.P., Epsilon Structured Strategies Master Fund L.P., and Westford Special Situations Master Fund, L.P. UF-14. Each Master Fund had feeder funds, through which investors would invest, with the feeder funds then investing into the Master Fund (the "Feeder Funds"). UF-15.

26. The Feeder Funds for Epsilon Global Master Fund, L.P. were: Epsilon Global Active Value Fund, L.P. and Epsilon Global Active Value Fund, Ltd. (collectively, the "Epsilon I Fund Family"). UF-16.

27. The Feeder Funds for Epsilon Global Master Fund II, L.P. were: Epsilon Global Active Value Fund II, L.P., Epsilon Global Active Value Fund II, Ltd., Epsilon Global Active Value Fund II-B, L.P., Epsilon Global Active Value Fund II-G, L.P., Epsilon Global Active Value Fund II-G Ltd. (collectively, the "Epsilon II Fund Family"). UF-17.

28. The Feeder Funds for Westford Special Situations Master Fund, L.P. were Westford Special Situations Fund, L.P. and Westford Special Situations Fund, Ltd. (collectively, the "Westford Fund Family"). UF-18.

29. The Feeder Funds for Epsilon Structured Strategies Master Fund, L.P. were: Epsilon Structured Strategies Fund, L.P. and Epsilon Structured Strategies Fund Ltd. (collectively, the "Epsilon III Fund Family"). UF-19.

30. The four Defendants that are Management Companies are: Epsilon Investment Management, LLC ("EIM"), Westford Asset Management, LLC ("WAM"), Epsilon Global Asset Management, Ltd. ("EGAM"), and Westford Global Asset Management, Ltd. ("WGAM"). UF-20.

31. Other personnel assisted Stevanovich in managing loans made to PCI, including senior investment manager Greg Bell, Amir Emami, and Camille Chee-Awai. UF-53. Bell and Chee-Awai both reported directly to Stevanovich. UF-54. Amir Emami was employed by EIM from around August 2002 through 2011. TSF-146, TSF-149. Amir Emami reported to Chee-Awai. UF-55. Chee-Awai worked as Managing Director at Epsilon and Westford from 2002 through 2005. TSF-151. She later left and went to work for Petters. TSF-157.

32. The Management Companies were the General Partner and/or Investment Manager of the Master Funds, UF-21, and managed their assets, UF-22; *see also* SGS

(10/30/23) Decl. ¶ 10. The investment manager made all of the decisions on behalf of the funds, and maintained the books and records of the company. UF-26.

33. The Master Funds or Feeder Funds paid various quarterly and annual fees to the Management Companies. UF-23. The Management Companies charged those fees in two components, a fee of 1.5 percent or 2 percent of assets under management and a fee of 20% of any gains. UF-25. The Management Companies did not issue invoices to the investment funds for services rendered. UF-24.

34. Each of the following Defendants was organized under the laws of the Cayman Islands: Westford Special Situations Master Fund, L.P.; Westford Global Asset Management, Ltd; Epsilon Global Master Fund, L.P.; Epsilon Global Master Fund II, L.P.; Epsilon Global Asset Management, Ltd.; and Epsilon Structured Strategies Master Fund, L.P. (the "Cayman Defendants"). UF-27.

35. Each of the following Defendants was organized under the laws of the British Virgin Islands: Westford Special Situations Fund, Ltd.; Epsilon Global Active Value Fund, Ltd.; Epsilon Global Active Value Fund I-B Ltd.; Epsilon Global Active Value Fund II-B Ltd.; Epsilon Global Active Value Fund II-G Ltd.; Epsilon Global Active Value Fund III Ltd.; and Stafford Towne, Ltd. (the "BVI Defendants").

36. Stevanovich created the Master Funds and the Feeder Funds between 2001–2005. TSF-103. Stevanovich directed and managed all the Master Funds and Feeder Funds during the relevant period. TSF-106.

37. During the relevant time, Stevanovich was the founder, president, managing member, portfolio manager, lead principal, and ultimate beneficial owner of the Management Companies. TSF-105.

38. At various times, Stevanovich owned Management Companies EIM and WAM through a group of entities known as Ally Kat. TSF-107. The Ally Kat entities include Ally Kat Trust, Ally Kat Holdings, LP, and Ally Kat Asset Management LLC. TSF-701.

39. At various times, Stevanovich owned Management Companies EGAM and WGAM through related entities, such as EIM. TSF-108.

40. On September 12, 2000, Stevanovich also formed a standalone fund outside the master-feeder fund structure called Capital Strategies Fund Ltd. ("Capital Strategies"). TSF-112. Stevanovich was the first and remains the sole director of Capital Strategies. TSF-113. Chee-Awai was a director of Capital Strategies for a time along with Stevanovich, but Stevanovic had final say regarding investment opportunities. TSF-152–153.

41. According to Stevanovich, he "was in charge of everything." SGS Tr. (12/14/11) at 679:1–13. Stevanovich made the final decisions regarding the hedge fund Defendants' investments, including Capital Strategies. TSF-109.

42. Stevanovich viewed the Management Companies as all one company, and it did not matter which Management Company was paid because it always went "into the same pocket." TSF-110. In terms of his own compensation, Stevanovich explained that after paying expenses of the Management Companies, "what's left comes to me." SGS Tr. (6/15/12) at 51:12–18; TSF-111.

## III.  Defendants' Lending to PCI and PL Ltd.

### A.  The Start of the Lending Arrangement

43. From 2001 to 2007, Stevanovich, through the Corporate Defendant hedge funds and Capital Strategies, lent over $2.4 billion to PCI and received nearly $2.8 billion in return. TSF-118. The net gain of over $320 million was paid to Defendants in the form of interest on those loans.[8]

44. In addition to the PCI loans, the Master Funds also invested in equities, bonds, bank debts, trade claims, options, swaps, futures, Credit Default Swaps, Collateralized Debt Obligations, Collateralized Loan Obligations, and other investments involving entites entirely unrelated to the Petters scheme. SGS (10/30/23) Decl. ¶ 7. During the same period that the Master Funds received interest payments on the loans to PCI and PL Ltd., they also received returns on other investments. SGS (10/30/23) Decl. ¶ 8. Similarly, the Management Companies received fees from other unrelated investments they oversaw that were unrelated to Petters, PCI, or Petters-related companies. SGS (10/30/23) Decl. ¶ 7.

45. The opportunity to invest in PCI was introduced by Boyd Lewis to Defendants in late 1999. UF-36. Lewis shared the opportunity with Frits Lieuw-Kie-Song, an investment manager for EIM, who told Stevanovich about the opportunity. SGS (10/30/23) Decl. ¶ 12. Greg Bell, who had been a classmate of Stevanovich at the University of Chicago, was a senior investment professional working for Defendants. He was responsible

---

[8] Throughout the Trustee's trial briefing, the Trustee refers to these interest payments as "false profits." The Court does not adopt the Trustee's preferred terminology and notes that the Eighth Circuit Court of Appeals has specifically said "that term is not accurate" in this very context. *Kelley v. Boosalis*, 974 F.3d 884, 889 n.3 (8th Cir. 2020).

for looking at the private loans and investments with private companies. UF-37–38; SGS (10/30/23) Decl. ¶ 11. Stevanovich instructed Bell to follow up, and Bell was responsible for initially reviewing the opportunity to invest in Petters. UF-39; UF-40; SGS (10/30/23) Decl. ¶ 12. Bell suggested that the possibility was worth a closer look after doing "some initial research." SGS (10/30/23) Decl. ¶ 13.

46. Chee-Awai was the Defendants' relationship manager with the Petters organization and was Coleman's main contact with Defendants. TSF-155–156. After Chee-Awai left employment with Defendants, she went to work for Petters as Executive Vice President and Managing Partner for Petters Group Worldwide. TSF-157–158. After Chee-Awai left, Ameri Emami took over the Petters relationship and helped monitor and negotiate rates for loans with Petters. TSF-159.

47. Defendants made their first loan to a Petters entity to PCI. SGS Tr. (12/14/11) 692:1–6; UF-48. Stevanovich said that the loan to PCI was to "test the waters." *Id.* 692:11–15. Capital Strategies funded the first loan of $1,500,000 to PCI in April 2001. Ex. J-226 at 2. After that, Defendants made no other loans to PCI, and all subsequent loans were made to PL Ltd. SGS Tr. (12/14/11) 692:16–20. PCI repaid the first loan more  than a month late. The loan's original maturity date was June 19, 2001, but the loan was not paid off until July 23, 2001. Ex. J-226 at 2.

48. PCI first attempted to repay the first loan by a check for $1.545 million, but the check bounced due to insufficient funds. Ex. J-002 (bounced check).

49. Petters established PL Ltd. as a SPE to facilitate loans, and PL Ltd. was substantially interrelated to PCI. TSF-209. Petters owned 100 percent of PL Ltd.'s shares

and was PL Ltd.'s director, CEO, and CFO. TSF-211. Eventually, in November 2013, PL Ltd. and PCI were substantively consolidated as part of PCI's bankruptcy case because the two entities were structurally and operationally interrelated, PL Ltd. was not independently governed, both companies had a unity of equity interests and ownership, and they commingled assets and business functions. Doc. 127 (proposed findings 1(c), 1(d), 1(e)). PL Ltd. never had an independent director from 2001 to 2005 when Defendants made loans to it, and Defendants did not seek appointment of an independent director. Doc. 127 (proposed finding 4(c)).

50. Although the creation of PL Ltd. as an SPE was intended to provide greater security for Defendants by ensuring that any collateral for the loans was not part of PCI's estate, Defendants neither sought nor obtained true-sale or non-consolidation opinions from their attorneys concerning the transactions underlying the loans. Sept. 12, 2022 Order (adopting proposed finding 5(g)); SGS Tr. (12/14/11) 713:8–18.

51. Mr. Stevanovich ultimately authorized making the loans to PL Ltd. SGS Tr. (12/14/11) 689:24–690:1. During 2001, Defendants loaned PL Ltd. another $78 million. Petters repaid three of the loans in 2001 late. Ex. J-226 at 2.[9]

**B. The Lending Contracts**

52. The loans from Petters' companies to Defendants were governed by a Master Loan Agreement, and PL Ltd. provided security for the obligations it incurred under that agreement in several ways. UF-50.

---

[9] Over the course of the lending by Defendants to PCI and PL Ltd., Petters repaid thirteen loans late. Ex. J-226 at 14.

53. Aside from the first few loans to Petters' companies, Defendants' loans to PL were governed by a Master Loan Agreement ("MLA") that was executed on October 31, 2001. UF-49; SGS Tr. (12/14/11) 697:4–16; Ex. J-209. The MLA streamlined paperwork obligations for the loans that the Master Funds made to PL. SGS Tr. (12/14/11) 697:4–16.

54. A SPE called Stafford Towne, Ltd., was established by Stevanovich as the collateral agent and administrative agent for the lenders (the Master Funds) under the MLA. Ex. J-209. Stafford Towne was a subsidiary of one of the funds, and it was used as an administrative agent on behalf of Defendants. SGS Tr. (12/14/11) 718:16–24. Under the MLA, Stafford Towne would identify which Master Fund was making the loan to PL Ltd. Ex. J-209 at 4; SGS Tr. (4/24/18) 123:10–124:3.

55. PL Ltd. executed an Amended and Restated Security Agreement ("Security Agreement"), which gave the lenders' administrative agent a security interest in all of PL Ltd.'s personal property assets. UF-50. PL Ltd. also executed an Assignment Agreement between PCI and PL Ltd. for the benefit of the applicable Master Fund making the loan. *Id.*

56. In addition to the MLA, PL Ltd. entered a Depository Account Pledge Agreement ("DAPA") on October 31, 2001. UF-50; J-208. Under the DAPA, PL Ltd. gave the administrative agent, Stafford Towne, a security interest in two deposit accounts at Highland Bank, each of which was in the name of PL Ltd. UF-50.

57. The MLA included several provisions designed to protect the Master Funds' interests. The MLA required PL Ptd. to provide an inventory purchase order for each loan and to grant a security interest on the inventory and in PL Ltd.'s bank accounts. It also

required UCC filings to perfect the security interest and a purchase order from the retailer to whom the goods were ostensibly being sold. Ex. J-209; Ex. J-207 at 73 (Security Agreement).

58. The MLA provided that the Master Funds' loans would not exceed 70 percent of the cost of the merchandise to be purchased with the funds, which meant that PCI or PL Ltd. would otherwise fund at least 30 percent of the purchase price for any merchandise diversion agreement. Ex. J-209 at 10.

59. Under the MLA, when a retailer purportedly paid for a shipment of diverted goods, the funds were to be deposited directly to PL Ltd.'s account at Highland Bank. Ex. J-209 at 2. The MLA prohibited PL Ltd. from withdrawing funds from the Highland Bank depository account without consent from the administrative agent and expressly permitted the administrative agent to withdraw funds from the account without seeking PL Ltd.'s consent. Ex. J-209 at 11 § 3.3.

60. PL Ltd. agreed to provide the Defendants' administrative agent with monthly unaudited financial statements prepared in conformity with Generally Accepted Accounting Principles ("GAAP"). Ex. J-209 at 14 § 5.1. PL Ltd. also agreed to provide evidence satisfactory to the administrative agent that it instructed its retailer-customer, in writing, to make all payments the customer owed by wire transfer directly to the Highland Bank deposit account. Ex. J-209 at 10 § 3.2(j).

61. The Master Funds making loans under the MLA had the authority to inspect PL Ltd.'s properties, books, and financial records. The lenders could inspect any warehouse or

location where inventory was stored. And the lenders were authorized to make copies of PL's books of accounts and other financial records. Ex. J-209 at 15 § 5.5.

62. PCI and Petters personally guaranteed the obligations that PL Ltd. incurred under the MLA. UF-51; Ex. J-207 at 57–69 (guarantees).

**C. Interest Rates**

63. Typically, interest rates on a promissory note are tied to how risky the transaction is—the higher the risk on the transaction, the higher the interest rate. Martens Decl. ¶ 10 (Doc. 254). The loans Defendants made to PL Ltd. were low-risk, purchase-order financing transactions. *Id.* ¶ 11. For example, PL Ltd. had purchase orders from a large, big-box retailer for brand name televisions and a second purchase order to send to a vendor to fulfill the orders. *Id.* PL Ltd.'s profit on the transaction was to be made based on the price difference between the purchase of the televisions and the sale. *Id.*

64. Other factors also contributed to the low-risk nature of the loans Defendants made to PL Ltd., including: the guarantees from PCI and Petters for the transactions; the representation that PCI had its own equity participation interest in each transaction of 10–30 percent; the security interests provided to the lenders; and the use of a dedicated account for the retailers to directly deposit payments that was accessible only by the administrative agent. Martens Decl. ¶ 12.

65. The annualized interest rate on the first loan transaction was 36 percent, and the next five notes had an annualized interest rate of 48 percent. Martens Decl. ¶ 14. The rates lowered a bit over time, but the median interest rate was 30 percent. *Id.* Out of 149 loan dates, only one loan date had a rate below 18 percent, and that was the final loan funding

date (November 2, 2006), where Defendants made three loans at an annualized rate of 12 percent. *Id.*

66. One of the Trustee's expert witnesses, Theodore F. Martens, credibly and persuasively opined that PL Ltd. paid Defendants interest rates that exceeded the low risk presented to Defendants in the loan transactions at issue in this case. Martens Decl. ¶ 13; *see also* McKinley Decl. ¶ 22 (opining that annualized rates of 36 percent to 48 percent "were not economically feasible or reasonable for the PCI loans") (Doc. 255). "Th[e] interest rates are unreasonably high and do not appear to reflect any market trends or any unique characteristics about the business transactions underlying the Notes." Martens Decl. ¶ 14. Martens compared the interest rates charged between 2001 and 2006 on these transactions with three benchmark rates and "observed a clear and obvious disparity between th[o]se benchmark rates and those rates PCI offered to its lenders." *Id.* ¶¶ 16–17; J-101 (comparing average prime rate, AAA corporate bond rate, and Treasury Constant Maturities Rates to loans made by Petters' companies' large private investors, including Defendants).

67. Another expert witness for the Trustee, Martin McKinley, testified that the big-box retailers to which PCI and PL Ltd. purportedly diverted goods "possessed substantial market power, and would not have paid a price for the PCI goods that generated sufficient profits to make the transaction profitable for PCI, at least at the high interest rates PCI paid to lenders." McKinley Decl. ¶ 22. "To support a loan at 36% to 48% interest requires substantial profit margins, margins that were not available from the retailers purportedly purchasing PCI's goods." *Id.*

### D. Alarm Bells and Due Diligence

The Trustee asserts that several issues that arose prior to and during the lending relationship put the Defendants on notice that PL Ltd. and PCI were insolvent or engaged in fraud. Defendants assert that they conducted a diligent investigation into the lending opportunity and had good reason to believe that they were making investments in a solvent and legitimate business.

#### *Mr. Stevanovich's Trial Declaration*

68. Mr. Stevanovich provided a trial declaration describing the efforts Defendants made to investigate Petters' business model and determine whether to begin providing the purchase order financing Petters was seeking. SGS (10/30/23) Decl.

69. Mr. Stevanovich and Greg Bell researched PCI's business model and considered that Petters made "demands for heightened discretion." SGS (10/30/23) Decl. ¶ 15. Petters told them that "manufacturers viewed entities involved in the PCI business model as 'diverting goods' through distribution chains they had not authorized and there was the risk that a manufacturer may try to stop orders from being delivered." *Id.* Because of this, Petters did not want lenders to contact retailers or vendors so that the latter would not "become spooked and refuse to consummate the transactions." *Id.*

70. Mr. Stevanovich and Bell visited Sam's Club and Costco and "saw that they were selling the types of products for which Petters was seeking financing." SGS (10/30/23) Decl. ¶ 16. Mr. Stevanoivch also understood that "Sam's Club and Costco were not 'authorized sellers' of the products which was another reason for confidentiality." *Id.*

71. Defendants retained Arthur Andersen "to provide due diligence services in connection with a proposed investment" by the Epsilon Master Funds. SGS (10/30/23) Decl. ¶ 17. Mr. Stevanovich testified that "Arthur Andersen issued a report to [Defendants] verifying what we asked it to verify. The report did not note any irregularities." *Id.* ¶ 18.

72. Defendants also "ran UCC lien searches which revealed [Petters'] creditors, including General Electric Capital Corporation ('GE Capital') who was known in the industry for its extensive due diligence, that were lenders to Petters' diverting goods business." SGS (10/30/23) Decl. ¶ 19.

73. Mr. Stevanovich also "knew that Tom Petters owned other businesses." SGS (10/30/23) Decl. ¶ 20. For Mr. Stevanovich, "Petters, by all accounts, seemed to be a successful businessman with experience in the diverting business; and the diverting business appeared to be a good business model." *Id.*

74. When Defendants "decided to move forward with the opportunity, [they] retained Oppenheimer Wolff & Donnelly LLP ('Oppenheimer'), a reputable law firm in the Twin Cities as legal counsel. Petters was represented by Fredrickson & Byron ('Fredrickson'), who I understood represented Petters in all his businesses." SGS (10/30/23) Decl. ¶ 21. "The involvement of reputable local law firms representing the Master Funds and Petters gave [Mr. Stevanovich] comfort that the opportunity was a good one." *Id.* Further, Defendants relied on their attorneys at Oppenheimer to ensure that "each loan package was in order," including that PL (and not PCI) had issued the purchase orders and invoices and that descriptions in the purchase orders matched. *Id.* ¶ 29.

75. During the course of the Defendants' lending relationship with PL Ltd., Mr. Stevanovich learned of Petters' founding and acquisition of several business ventures, leading him to believe Petters' businesses had significant assets. SGS (10/30/23) Decl. ¶¶ 33–34.

76. Mr. Stevanovich testified that during the period of lending activity by the Master Funds to PL Ltd, he did not know that that Petters was engaged in fraud. SGS (10/30/23) Decl. ¶ 35.

### GE Capital

77. Before making loans to PL Ltd., Mr. Stevanovich learned that another investor, GE Capital, had been providing financing to Petters' companies for years. SGS Tr. (12/14/11) 711:7–19; SGS Tr. (4/24/18) 96:6–14. Because of GE Capital's lending, and because "GE Capital typically does a lot of due diligence," that gave Defendants "comfort" in making the decision to loan funds to Petters' companies. SGS Tr. (4/24/18) 96:6–14; Stevanovich Decl. ¶ 19.

78. Mr. Stevanovich did not contact GE Capital before lending to PL Ltd., and instead only looked at GE Capital's UCC filings. SGS Tr. (12/14/11) 711:7–16. GE Capital stopped lending to Petters' companies in 2000, which Defendants discovered prior to first lending to PL Ltd. *Id.* at 712:2–7. When Stevanovich learned that GE stopped lending, Defendants did not reach out to GE Capital to find out why it had ceased its lending activity with PCI. *Id.*; Sept. 12, 2022 Order (adopting proposed finding 5(h)).

### *Arthur Andersen Review*

79. In December 2000, prior to lending any money to PCI and PL Ltd., Defendants hired Arthur Andersen to conduct an investigation regarding the investment opportunity. UF-42; SGS (10/30/23) Decl. ¶ 17 (Doc. 257). Arthur Andersen issued a report dated February 19, 2001 (the "Arthur Andersen Report"). UF-43; J-014.

80. Arthur Anderson did not do an audit in preparing its report because Defendants did not ask for an audit. UF-44; Emami Tr. (8/3/11) 48:3–8. Mr. Stevanovich signed off on the method of Arthur Andersen's investigation. SGS Tr. (4/24/18) 99:8–11. Arthur Andersen limited its investigation based on Defendants' request. SGS Tr. (4/24/18) 100:15–21.

81. Arthur Andersen was asked to "[v]erify that Petters has received payment from Costco Wholesale Corporation for all transactions completed during fiscal year 2000, approximately 62 transactions through December 11, 2000." SGS Tr. (4/24/18) 98:2–9; J-014 at 2. Similarly, Defendants asked the firm to "[v]erify that Petters is current on its obligations to each of its creditors as of the date of [December 11, 2000] and select a sample of the payments made by Petters to creditors for compliance with the terms of those arrangements." J-014 at 2.

82. Defendants asked for this limited review because they did not want "a full-blown audit of Petters, but to identify things for [Arthur Andersen] to look at to see if there's any need to do anything more; are we comfortable enough that this person is doing what he's telling us he's doing." SGS Tr. (4/24/18) 98:10–15. Stevanovich states that "the fact that PCI's financial statements were not audited was not odd to [Defendants] because

24

most privately held companies did not have audited financials in [Defendants']
experience." SGS (10/30/23) Decl. ¶ 18.

83. Petters asked Defendant not to contact Retailer Customers. UF-41. The
Defendants did not contact any of the customers that Petters claimed were purchasing
goods because Petters "made it a point that [they] would not be allowed to do this." SGS
Tr. (12/14/11) 685:14–22. Defendants also did not contact any of the vendors who were
purportedly selling the goods to the retailers through Petters' businesses. SGS Tr.
(12/14/11) 689:9–17. If Defendants had asked Arthur Andersen to do a full audit, it would
have had to contact the retailers purportedly paying to PCI. Emami Tr. (8/3/11) 48:9–13. If
auditors would have contacted the retailers, they would have discovered that all the
purchase orders were fake. Coleman Tr. (12/12/11) 130:10–13; Coleman Decl. ¶ 41.

84. Arthur Andersen did not investigate Petters' purported suppliers, Nationwide
and Enchanted. Any investigation into the suppliers by Defendants would have revealed
that both were shams. Coleman Decl. ¶ 42. Mr. Stevanovich could not recall asking Arthur
Andersen to look into those vendors, nor could he recall why he did not do so. SGS Tr.
(4/24/18) 99:12–100:10.

85. The Court has already found that limitations on Arthur Andersen's investigation
procedures meant that the firm "could not express opinions about PCI's internal control
over financial reporting, nor make representations concerning the 'accuracy and
completeness' of the financial information upon which it relied in generating the report."
Sept. 12, 2022 Order (adopting proposed finding 5(d)). Further, the Court has found that
the minimal report by Arthur Andersen did not do enough to satisfy any of the applicable

and accepted due diligence principles. Sept. 12, 2022 Order (adopting proposed finding 5(e)).

86. Arthur Andersen's report expressly stated that it did not perform more than the limited tasks that Defendants asked, and that it could not make any representations or express any opinion on several issues, including "the sufficiency of the procedures for [Defendants'] purposes." J-014 at 3. It further noted that because Arthur Andersen "relied on records that were not audited, [it] cannot assure you that [its] findings in all areas are accurate and complete." J-014 at 6.

87. In the Arthur Andersen Report's "summary findings," the firm stated:

> We noted several instances where Petters did not make cash payments to the vendors for the goods received, but did receive cash payments from their customers. Upon discussions with management, it was noted that in some instances Petters' creditors prefer to make payments to Petters' vendors directly and not wire the funds to Petters. Additionally, there are times when Petters asks its creditors to wire funds directly to their vendors depending on Petters' cash position at the time of vendor payment.
>
> There were also five instances in which we were unable to agree cash receipts on the Aging Report to cash receipts on the bank statements as the bank statement's deposit balance was greater than the amount noted to be received from customers. Per discussion with management, it was noted that this is due to Petters receiving checks from other creditors (investors) that were included in the daily deposit amounts. As detailed information was not readily available, we were unable to verify that these deposit amounts included payments from Costco.

J-014 at 5.

88. Elsewhere in the Arthur Andersen Report, the firm stated that it reviewed a schedule of approximately 148 notes with principal amounts ranging from $20,000 to

$4,890,000, where the majority of the notes had principal amounts between $1M and $4M. The majority of the notes had maturity dates of approximately three months, with monthly interest rates between 3 percent and 5 percent. About half of the notes, creditors secured the notes by filing UCC security interests on specific merchandise. J-014 at 7.

89. Arthur Andersen was able to trace principal and interest payments to corresponding wire transfers or checks and "agree" payments to PCI's bank statements to the terms stated in corresponding promissory notes. *E.g.*, J-014 at 5–6; J-015.

90. Arthur Andersen recommended that Defendants "require monthly financial statements from [Petters] prepared in accordance with [GAAP]. This would allow [Defendants] to stay current on [Petters'] results of operations and financial position." J-014 at 8. As explained elsewhere in this Order, although the MLA required such monthly GAAP financial statements, Defendants immediately waived that requirement and never received them throughout their lending activity.

91. Arthur Andersen also recommended "requiring [Petters] to be audited annually, in order to provide more reliance on its financial reporting disciplines." J-014 at 8. Defendants did not require annual audits of PCI or PL Ltd.

### No Audit, No Audited Financials

92. The Defendants' business with PL Ltd. and Petters often did not conform to the arrangement reflected in the loan documents. *See* SGS Tr. 12/14/11 702:2–4. For example, although the MLA allowed Defendants to request a review of PCI's bank records, they never requested to do so. Emami Tr. (8/3/11) 201:16–25; J-209 at 14 § 5.1(a); SGS Tr. (12/14/11) 702:2–22.

93. Defendants never required an audit of PCI or PL Ltd. Sept. 12, 2022 Order (adopting proposed finding 5(f)). Defendants never requested audited financials from PCI or PL Ltd. despite knowing that failing to do so presented a risk. SGS Tr. (12/14/11) 690:19–23, 709:11–21; Emami Tr. (1/17/18) 119:14–16, 120:3–16. Mr. Stevanovich knew that PCI's financial statements were not audited, and he never asked for audited financial statements. UF-45.

94. Mr. Stevanovich indicated that investment decisions were based on "a lot of different things," so requiring audited financials "wouldn't be necessary depending on the situation." SGS Tr. (4/24/18) 95:13–23. Stevanovich recognized the lack of audited financials created a risk that Defendants might not be repaid. SGS Tr. (12/14/11) 690:19–23.

### *Inaccuracies in Paperwork and Purchase Orders*

95. There were signs that PL Ltd. did not, in fact, have the 10–30 percent equity stake in the purchase order transactions as required by the loan agreements. Communications between Defendants and Petters' companies "contained discrepancies regarding PCI's required equity interest in the transactions," and Defendants "noticed [those] inaccuracies from 2002 to 2006." Sept. 12, 2022 Order (adopting proposed finding 6(b)); *see also id.* (adopting proposed finding 6(c): Defendants "noticed discrepancies that called into question the actuality of PCI's equity or participation").

96. There were frequent errors and irregularities in the transaction documents connected to Defendants' loans, especially with details in the purchase orders that Coleman and, on occasion, White fabricated to make the transactions appear legitimate. *See* Coleman

28

Decl. ¶ 31; Sept. 12, 2022 Order (adopting proposed finding 6(b)). "[I]tems listed on a Retailer-Customer Purchase Order would sometimes not match the corresponding Vendor Purchase Order." Coleman Decl. ¶ 32. Defendants "required that the invoice to Enchanted or Nationwide actually sa[id] PL instead of PCI, and [Coleman] would forget to do that[,] so [she] would have to redo the invoices with the correct entity name." Coleman Decl. ¶ 33.

97.  Defendants became aware of these types of errors as early as October 2002. J-017 (Emami email to Greg Bell). Attorney Mark Tranovich, a transactional attorney for Defendants, identified mistakes in the paperwork for Defendants' loans to PL and brought those issues to Coleman's attention. Coleman Decl. ¶ 34. Tranovich brought those errors to Coleman's attention "along with Ms. Chee-Awai, Mr. Emami, and Mr. Stevanovich." *Id.* "It reached a point where the mistakes were so frequent in the paperwork that [Coleman] was concerned about sending anything to Mr. Tranovich." *Id.* These and other errors are reflected in Tranovich's emails to Coleman and White, several of which copied Defendants' own personnel. *See* J-021, J-022, J-023, J-024, J-025, J-026, J-027, J-028, J-029, J-030.

98.  It was important to Defendants that purchase orders matched before financing a deal to ensure that the transaction was what it purported to be and to have accurate descriptions of the products for UCC purposes. Emami Tr. (12/14/11) 738:19–739:24. Generally, Defendants' personnel, including Mr. Stevanovich, would discuss issues that arose when they received information from Coleman. Emami Tr. (1/17/18) 99:21–100:17. However, "[t]here is no evidence that [Defendants] did anything but bring such inaccuracies in purchase-order documentation to the attention of Coleman and White[.]" Sept. 12, 2022 Order (adopting proposed finding 6(d)). Defendants never told PL or PCI

that they would stop lending to PL because of the frequent errors in loan documents. Coleman Decl. ¶ 36.

### No Direct Payments from Retailers to the Lockbox Account

99. Although under the parties' agreements, the ostensible retailer-customers were supposed to make payments directly to the Highland Bank "lockbox" account, Defendants and PCI did not comply with that procedure. Coleman Decl. ¶ 23. Before the repayment on the first loan was due, Defendants' attorney, Michael Zalk, wrote to PCI to remind them to instruct the retailer-customers to pay invoices directly to the lockbox account. *Id.* ¶ 24; J-040 (Zalk Letter (Jun. 12, 2001)). However, because there were no real transactions happening with the purported retailer-customers, no payments were ever paid by any customers to the Highland Bank lockbox account. Coleman Decl. ¶ 25.

> In reality, PL would send Epsilon's[10] loans to the fraudulent merchandise vendors, usually Enchanted Family Buying Company ("Enchanted") or Nationwide International Resources ("Nationwide"). Enchanted and Nationwide would then take a commission and send the money back to PCI. PCI would then use that money to repay other investors and to cover PCI's expenses. When it was time to repay an Epsilon Loan, PCI would take comingled money from other investors and send that money to the Highland Bank account.

*Id.* ¶ 26.

100. Receiving payments directly from the big box retailer customers was reportedly Defendants' "overriding principal" and "deciding factor" in entering the loan transactions. Emami Tr. (8/3/11) 100:12–101:8. However, Defendants knew that the

---

[10] Internally at Petters' companies, Coleman and others referred to Defendants' various businesses collectively as "Epsilon." Coleman Decl. ¶ 11.

retailer customers were not ever actually wiring payments directly to the Highland Bank lockbox account, and the wire transfers to the lockbox account came from PCI instead. *Id.* at 85:10–86:19; Emami Tr. (12/14/11) 748:23–749:16. For example, on one occasion, Coleman wrote to Chee-Awai in January 2003 stating that PCI received a payment from Costco and that PCI—not Costco—would transfer the money to the lockbox account. Coleman Decl. ¶ 27. Coleman emailed Chee-Awai on April 1, 2003, stating that she was unlikely to be able to wire funds that day unless a payment was received from a vendor, but she told Chee-Awai that "tomorrow morning I will be able to [wire the funds] even if we don't get a payment in." J-018. Mr. Emami emailed Coleman on April 2, 2003 to request payment even if payments did not come in from a retailer customer to PCI. J-019; Coleman Decl. ¶ 29.

101. At the time of the loan repayments, Mr. Stevanovich was personally aware that payments were not being made to the Highland Bank lockbox account by the retailer customers ostensibly involved in the underlying purchase order transactions. SGS Tr. (12/14/11) 720:24–721:5.

102. Defendants reached a verbal agreement with Petters that the absence of direct payments from the retailer customers was acceptable if the funds went to PCI and then were sent to Defendants' account within 24 hours. Emami Tr. (12/14/11) 757:16–22. That agreement was never reduced to writing. *Id.* at 758:8–13.

### *Purchase Order Financing Best Practices*

103. The Trustee's expert, Martin McKinley, testified concerning the principles lenders ought to adhere to when participating in purchase-order financing of the kind that

Defendants engaged in with PL Ltd. McKinley Decl. (Doc. 255). McKinley explained that there are three best practices for lenders, including "(1) purchase order verification, (2) control over the movement of goods, and (3) cash dominion with payment coming directly to the lender." *Id.* ¶ 15.

104. With respect to purchase order financing, McKinley states:

> Purchase order verification, the first step, occurs when the account debtor issues a purchase order to a potential vendor. The lender becomes involved with the transaction at this time because the account debtor is making the determination they will need financing for this transaction. If the lender were to give the account debtor no credit, the transaction would not close. The lender will communicate with the vendor to identify the terms required by the vendor to close the transaction. These terms usually include the issuance of an irrevocable line of credit that will allow the vendor to be paid when the vendor meets the condition of the letter of credit, which should be the same conditions set forth in the purchase order. When the goods are available for shipment, the vendor can present the letter of credit for payment. If the account debtor prohibits the lender from contacting the vendor, the lender should not proceed with [the] loan because there is no basis to verify that the proposed transaction is legitimate. A failure to verify a purchase order with a vendor is unreasonable.

McKinley Decl. ¶ 16.

105. McKinley describes the second practice as follows:

> Control of movement of goods to the account debtor, the second step, allows the lender to maintain its security in the goods. A lender should verify that the vendor can live up to the terms of the purchase order, including meeting time deadlines, and have the capability to produce the goods. If the vendor cannot meet the terms of the purchase order, the lender should not fund the transaction. Funding a transaction with a vendor who lack the capability to fulfill the terms of the purchase order creates risk to the lender that the vendor will take the funds without shipping the goods. The vendor should be paid only

once the vendor provides proof of shipment of the goods. This is the only means by which a lender can be assured that the goods will be delivered to the account debtor. Here, the Defendants failed to monitor the movement og good with the purported freight forwarder or take any steps to insure that the freight forwarder actually delivered goods. For the PCI scheme, the lenders (including the Defendants) failed to monitor and verify the existence and the movement of goods contrary to industry practice, and this failure was unreasonable.

McKinley Decl. ¶ 17.

106. For the practice of maintaining cash dominion, McKinley explains:

Cash dominion, the third step, is where the account debtor instructs the retailer purchasing the goods to make payment directly to the lender in order to maintain dominion of funds. A lender does not want the funds to go to the account debtor. With direct payment, an account debtor may not divert the payment from the lender. The lender then deducts fees and remits residual gross profit to the account debtor.

McKinley Decl. ¶ 18.

107. McKinley concluded that "none of the Defendants implemented any of the core disciplines for the PCI loans, by not engaging in purchase order verification, controlling the movement of goods to the account debtor, or maintaining cash dominion over payments from the retailer purchasing the goods. Had they done so, the Defendants would have immediately discovered that the PCI loans were fraudulent." McKinley Decl. ¶ 20. For example, if Defendants had taken steps to control the movement of goods, they "would have discovered no goods were transported by a freight forwarded or other common carrier." *Id.* ¶ 21. "And if the Defendants insisted that the retailer's payment be made directly to the Defendants' control (such as through a lockbox), the Defendants would have immediately discovered that retailers were not involved in the transactions." *Id.*

## CONCLUSIONS OF LAW

### I.    Legal Standards

#### A.  Fraudulent Transfers

This case involves actual fraud claims under the United States Bankruptcy Code and the Minnesota Uniform Fraudulent Transfers Act. Count I of the Second Amended Complaint asserts a claim of actual fraud pursuant to 11 U.S.C. § 548(a)(1)(A). Count II is a claim of actual fraud under 11 U.S.C. § 544(a) and (b) and Minn. Stat. §§ 513.44(a)(1) and 513.47. Count III is an actual fraud claim under 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551, regarding two-year transfers. Count V asserts an actual fraud claim pursuant to 11 U.S.C. §§ 544(a) and (b), 550(a), 551, and Minn. Stat. §§ 513.44(a)(1) and 513.47, seeking avoidance and recovery from Defendants as initial transferees and subsequent transferees.[11]

Under the United States Bankruptcy Code, a trustee can claw back a transfer made by the debtor if the transfer is "voidable" by a creditor. *Kelley v. Boosalis*, 974 F.3d 884, 899 (8th Cir. 2020) (citing 11 U.S.C. § 544(b)(1)); 11 U.S.C. § 544(b)(1) ("Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by

---

[11] The Trustee also asserted constructive fraud claims in Count IV, Count VI, Count VII, and Count VIII of the Second Amended Complaint. Second Am. Compl. (Doc. 7-10). The Trustee has elected to forego litigation on the constructive fraud claims. Pl.'s Opening Trial Br. 25 (Doc. 249). In addition, the Trustee brought a claim for lien avoidance pursuant to 11 U.S.C. § 506(d) (Count IX); a claim for turnover and accounting under 11 U.S.C. § 542 (Count X); and a claim for unjust enrichment/equitable disgorgement (Count XI). None of these claims are before the Court. The Trustee agreed to dismiss the lien-avoidance claim and the turnover-and-accounting claim. (Doc. 45). United States Bankruptcy Judge Kathleen H. Sanberg granted defendants' motion for summary judgment on the unjust enrichment claim. March 13, 2019 Summ. J. Order ¶ 4 (Doc. 8-4).

a creditor holding an unsecured claim. . . ."). To "avoid" a transfer the trustee must "(1) identify an existing creditor; (2) with an allowable claim; (3) who under non-bankruptcy law could avoid the transfer, at least in part." *Id.* (internal quotations omitted). This is often referred to as establishing the existence of a "predicate creditor." In addition to identifying a predicate creditor, to claw back transfers under 11 U.S.C. § 544(b)(1), a trustee "must show that the transfer is voidable under state law. . . ." *In re Marlar*, 267 F.3d 749, 753 (8th Cir. 2001).

Here, the relevant state law is the Minnesota Uniform Fraudulent Transfers Act ("MUFTA"), Minn. Stat. §§ 513.41–.51. Under MUFTA, a creditor can "recover assets that debtors have fraudulently transferred to third parties." *Finn v. Alliance Bank*, 860 N.W.2d 638, 644 (Minn. 2015). The purpose of MUFTA is not to create "equality among a debtor's creditors, even if they are victims of a Ponzi scheme." *Id.* at 652. Instead, MUFTA's "purpose is to prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors." *Id.* (cleaned up).

When a creditor claims that a debtor has transferred assets to a third party "with fraudulent intent" under Minn. Stat. § 513.44(a)(1), the creditor must "prove that the debtor made the transfer with the 'actual intent to hinder, delay, or defraud any creditor of the debtor.'" *Id.* at 644–45 (quoting § 513.44(a)(1)); *see also* 11 U.S.C. § 548(a)(1)(A) (allowing the trustee to "avoid any transfer . . . if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which

the debtor was or became . . . indebted"). These are known as "actual fraud" claims.[12] *Finn*, 860 N.W.2d at 644–45. "Because actual intent to defraud a creditor is rarely susceptible of direct proof, [the Minnesota Supreme Court] explained that a creditor may rely on various badges of fraud . . . to prove a debtor's fraudulent intent. *Id.* at 645 (cleaned up).

Under both the Bankruptcy Code and MUFTA, a creditor seeking to claw back fraudulent transfers from subsequent transferees has the burden to "trace" fraudulently transferred funds to the subsequent transferees. *See, e.g.*, *In re Dreier LLP*, Nos. 08-15051 (SMB), 10-03493 (SMB), 10-05447(SMB), 2014 Bankr. LEXIS 11, at *55 (Bankr. S.D.N.Y. Jan. 2, 2014) (discussing the trustee's burden at trial "of tracing . . . immediate transfers [to hedge funds] into the hands of the Managers as subsequent transferees"). A trustee can recover "the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1), (2). Similarly, under MUFTA, "the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less" against "(i) the first transferee of the asset or the person for whose benefit the transfer was made; or (ii) an immediate or mediate transferee of the first transferee, other than[] (A) a good-faith transferee that took for value[] or (B) an immediate

---

[12] Actual fraud claims are distinct from constructive fraud claims. *Finn*, 860 N.W.2d at 645 (describing the requirements to prove a claim of constructive fraud). As noted above, because the Trustee has chosen to forego his constructive fraud claims, there are no such claims before the Court.

or mediate good-faith transferee of a person described in subitem (A)." Minn. Stat. § 513.48(b)(1).

### B. Good Faith Defense

If a creditor proves that a debtor transferred assets with intent to defraud, a "transferee may still defeat liability by establishing the affirmative defense in Minn. Stat. § 513.48, which protects transferees who took the transfer in good faith and for a reasonably equivalent value." *Finn*, 860 N.W.2d at 645 (cleaned up). A person who invokes the defense that he received transferred property or funds "in good faith and for reasonably equivalent value," under Minn. Stat. § 513.48(a), "has the burden of proving the applicability of that subsection." Minn. Stat. § 513.48(g)(1). The transferee must establish this defense "by a preponderance of the evidence." *Id.* § 513.48(h). Similarly, under the Bankruptcy Code, a transferee who "takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c).

"MUFTA does not define 'reasonably equivalent value,'" and except in circumstances not relevant here, "the determination of whether a debtor received reasonably equivalent value in exchange for a transfer of its assets depends on the facts and circumstances of each case." *Finn*, 860 N.W.2d at 650. However, under MUFTA, "value is given for a transfer . . . if, in exchange for the transfer . . . an antecedent debt is secured or satisfied." *Id.* (quoting Minn. Stat. § 513.43(a)). "[D]eciding whether a debtor has received reasonably equivalent value is a function of the relative value received by the debtor in the underlying exchange." *Id.* "[S]atisfaction of an antecedent debt can constitute reasonably

equivalent value." *Id.* "[A]ny legally enforceable right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA." *Id.* at 651.

MUFTA also provides no definition of "good faith," and that term "has no recognized meaning under the Uniform Fraudulent Transfers Act." *Kelley v. Boosalis*, 974 F.3d 884, 897 (8th Cir. 2020).[13] "Good faith is not susceptible of a precise definition and is determined on a case-by-case basis." *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995).

## II.    The Actual Fraud Claims

### A.  Undisputed Issues

When the parties filed their Trial Stipulation, they agreed that "only three issues remain for trial." Trial Stip. ¶ 4. The remaining issues concern Defendants' affirmative defense of good faith and whether the Trustee has adequately traced assets to the Management Companies and Mr. Stevanovich. *Id.* In light of this stipulation, the Court finds that three elements of the Trustee's actual fraud claims are not in dispute. The Trustee has met his evidentiary burden to establish these elements.

First, the Court concludes that the Trustee has met his burden to demonstrate the "predicate creditor" element of the Trustee's claims. The Trustee has standing to assert the claims in this action under 11 U.S.C. § 544(b)(1) because the record establishes that there is at least one creditor, Ellistone Fund, with an allowable unsecured claim against PL Ltd. Ellistone made loans to PL Ltd. in 2008 and was not repaid almost $34,000,000. The Bankruptcy Court found that Ellistone has an allowed claim in the amount of $10,000,000,

---

[13] "The Bankruptcy Code does not define good faith." *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995).

and this Court has previously held that this fact is established for purposes of the litigation. Sept. 12, 2022 Order (adopting proposed finding 11(a)). Defendants admit that prior ruling means there is no remaining dispute over this element. Joint Stip. ¶ 5 (Doc. 134); Trial Stip. ¶ 4 (agreeing that only a limited number of issues remain for trial). Therefore the "predicate creditor" element of Plaintiff's claims is satisfied.

Second, pursuant to Minn. Stat. § 513.44(a) and 11 U.S.C. § 548(a)(1)(A) and (B), the Trustee has met its burden to show that PL Ltd. made transfers to the Master Funds. The parties' trial stipulation confirms that this issue is undisputed, Trial Stip. ¶ 4, and Defendants admit that they are only challenging the Trustee's ability to "meet his burden of tracing funds from PL to each of the Defendants *other than the Master Funds*," Defs.' Opening Trial Br. 49–50 (emphasis added). The Bankruptcy Court found that the Master Funds lent PL Ltd. $2,471,580,000.00 and were repaid nearly $2,795,000,000.00. Substantive Consol. Order 37–38; *see also* J-226 (summarizing 268 loans from Master Funds and 78 loans from Capital Strategies to PL Ltd. and identifying amounts borrowed, money in, and money out). The Trustee's expert's calculations show that PL Ltd. repaid the loans' principal in full along with interest, resulting in the Master Funds' receipt of over $274,000,000 in interest payments. J-232; J-233; J-234; J-235; J-236; J-237.

Third, the Trustee has shown that PL Ltd.'s transfers to the Funds were made with the intent to defraud creditors. Defendants do not dispute that PL Ltd. made transfers with intent to defraud. Trial Stip. ¶ 4. In addition, the Court previously found that the Trustee has established that PCI had actual intent to hinder, delay, or defraud its creditors given overwhelming evidence of PCI's overall intent to operate a fraudulent Ponzi scheme. Sept.

12, 2022 Order (adopting proposed finding 10(a)); *see also* TSF-30. The purpose of that scheme (and its effect) was for earlier lenders to be repaid with "stolen money" obtained on false pretenses from subsequent lenders. Sept. 12, 2022 Order (adopting proposed finding 1(g)). Moreover, the criminal convictions of those involved in the Petters Ponzi scheme demonstrate that the transfers were made with intent to defraud. UF-7; TSF-037–040.

Because the Trustee has established the primary elements of his claims, the Court next considers whether the Trustee has met his burden to trace transfers from the Master Funds to the Management Companies and Mr. Stevanovich.

### B. Tracing

The parties agreed that an open issue for the Court to decide is "whether the Trustee can prove that Defendants received transfers from the [Petters] Ponzi scheme." Trial Stip ¶ 4. The Court finds that the Trustee has met his burden to trace transferred funds from PCI and PL Ltd to the Master Funds, the Management Companies, and to Mr. Stevanovich.

First, the Trustee has shown the following receipts of interest payments from PCI and PL Ltd: Epsilon I Master Fund family received $87,601,542; the Epsilon II Master Fund family received $102,264,648; the Westford Master Fund family received $62,533,470; and the Epsilon III Master Fund family received $4,358,245. J-232. In addition, the Trustee has shown that Capital Strategies received $43,429,877, which in turn transferred funds to the Management Companies and Mr. Stevanovich. *Id.*; *see also* Yates Decl., Ex. 27 (Doc. 51-1) (Order Granting Trustee's Application for Entry of Default Judgment Against Defendant Capital Strategies Fund Ltd., as filed in *Kelley v. Westford*

*Special Situations Master Fund L.P. et al.*, No. 10-04396, Doc. 120 (Bankr. D. Minn. Apr. 7, 2015)). These interest payment transfers to the Master Funds and Capital Strategies total $318,187,782.

Second, the Trustee has met his burden to trace transfers from the Master Fund Families and Capital Strategies to the Management Companies. The Trustee has shown that the Master Fund Families and Capital Strategies transferred $59,261,441 in management and performance fees to EIM, WAM, EGAM, and WGAM. J-236. As explained by the Trustee's expert witness concerning tracing, Marti Murray, the Management Companies received these transfers through their 1.5 percent (for domestic funds) or 2 percent (for offshore funds) per annum management fees and their 20 percent performance fees charged to the Master Funds. Murray Report ¶¶ 38, 146 (Doc. 252-1).[14] Murray conducted a reasonable and persuasive analysis of the documentation available to reach her conclusions about the management fees ($7,876,220) and performance fees ($52,791,186) charged by the Management Companies that are attributable to the relevant interest payment transfers. Murray Report ¶¶ 146, 159–60, 161.

Finally, the Court concludes that the Trustee has met his burden to trace the transfers all the way to Mr. Stevanovich. The evidence shows that Mr. Stevanovich "was the ultimate recipient of substantially all fees paid to the [Management Companies] that were attributable to the" PCI scheme. Murray Decl. ¶ 14. Stevanovich's own testimony confirms

---

[14] To the extent Defendants object to the consideration of Murray's expert report, those objections are noted, but overruled. The Court previously denied Defendants' motion to exclude Murray's testimony. Daubert Hr'g 40–50 (Doc. 120).

this. SGS Tr. (6/15/12) 45:4–15 ("[I]t doesn't matter to . . . us which entity gets paid because it always goes into the same pocket."). He owned and controlled, either directly or indirectly through Ally Kat, EGAM, EIM, WAM, and WGAM. J-220 (explaining that EIM is the beneficial owner of EGAM, and EIM is owned and operated by Stevanovich); SGS Tr. (4/24/18) 46:08–11, 83:08–19. Mr. Stevanovich testified that "after I pay all the expenses of the [Management Companies], what's left comes to me." SGS Tr. (2/12/19) 153:25–154:8. And for at least the offshore management companies, EGAM and WGAM, Mr. Stevanovich explained that the net income was indistinguishable from gross income. J-222.

The evidence further establishes that Mr. Stevanovich withdrew more than $59,261,441 from the Management Companies during the time in which the Management Companies received at least that amount in management and performance fees attributable to business with PCI and PL Ltd. From 2001 through 2007, EIM and WAM (the domestic Management Companies) received a total of $14,630,534 in fees attributable to interest payments. Murray Report ¶ 164; J-236. The Ally Kat partnership K-1 filings show that Mr. Stevanovich received distributions from Ally Kat totaling $14,557,749 from 2004 through 2007, but similar documentation was unavailable for the years 2001, 2002, 2003, and 2008. Murray Report ¶ 165. During the same period, EGAM and WGAM (the offshore Management Companies) received fees attributable to interest payments totaling $44,630,907. Murray Report ¶ 167; J-236. Because Mr. Stevanovich indicated that net income from these two offshore management companies was the same as gross income,

there is no evidence of material deductions, and Mr. Stevanovich "directly benefited" in the full amount of the interest payments. Murray Report ¶ 168.

Murray traced cash into and out of EGAM and WGAM attributable to both management and performance fees between 2002 and 2008 and determined that the total funds received from interest payments on the loans was $117,298,179. Murray Report ¶¶ 170–71. For EGAM alone over that period, the total cash receipts were $77,577,568. *Id.* ¶ 171 & Table P. Mr. Stevanovich "had sole signatory authority for EGAM's account at "Capital G." *Id.* ¶ 172. For EGAM, "82% of the deposits into EGAM's Capital G account originated from the Stevanovich Funds." *Id.* Mr. Stevanovich's total teller withdrawals from the Capital G account was $49,812,709, which exceeded the $39,269,768 in fees paid to EGAM that were attributable to interest payments on loans to PL. *Id.*; *id.* ¶ 173.

Murray did not have the same documentation available for WGAM that was available for EGAM, but because Stevanovich testified that WGAM was "one of my investment companies," Murray determined that "[i]t is reasonable to conclude that WGAM's account at Capital G would have been similarly maintained to EGAM's account, with Stevanovich having sole signatory authority." *Id.* ¶ 174. Between July 18, 2003 and June 30, 2008, "WGAM was paid $39,720,921 by the Stevanovich Funds," *id.* ¶ 175, and between December 29, 2003 and March 27, 2008, "teller withdrawals from WGAM's Capital G account total[ed] $51,480,519," *id.* ¶ 175. According to Murray, therefore, the "amount that WGAM was paid in cash from the Stevanovich Funds ($39,720,920), as well as the amount withdrawn from WGAM's Capital G account through withdrawals marked

as teller withdrawals ($51,480,519), both exceeded the amount of fees credited to WGAM related to [interest payments] ($8,361,139)." *Id.* ¶ 176.

Between 2004 and 2008, joint tax returns filed by Mr. Stevanovich and his wife show gross income from all sources of $59,054,960, of which $41,916,246 came from foreign sources. *Id.* ¶ 179. Murray reasonably concluded that the percentage of gross income reported from foreign sources "is consistent with the fact that EGAM and WGAM were offshore entities that were receiving sizable Performance Fees from the Stevanovich Funds." *Id.* ¶ 180. Murray explained that "[b]etween distributions from Ally Kat and withdrawals from both EGAM's and WGAM's accounts at Capital G, Stevanovich received cash in a total amount of at least $115,850,978 in payments" between September 2003 and March 2008. *Id.* ¶ 182. Thus, Murray concluded that Mr. Stevanovich "received cash payments well in excess of the $60,667,405 in fees attributable to [interest payments from PL Ltd.]" *Id.* ¶ 183; *id.* ¶ 145. Further, Murray credibly testified to the opinion that "[a]s the ultimate beneficiary of the Management Companies, [Mr. Stevanovich] was the ultimate recipient of substantially all fees paid to the Defendant Management Companies that were attributable to the Petters Company Inc. Ponzi Scheme." Murray Decl. ¶ 14.

The greater weight of the evidence shows that Mr. Stevanovich received $14,640,534 in fees from the domestic Management Companies and $44,630,907 in fees from the offshore Management Companies attributable to interest payments from PL loans, for a total of $59,271,441.

*Defendants' Opposition*

The Defendants provided little evidence or argument to counter the Trustee's position on tracing. Primarily, Defendants' arguments regarding tracing are found in their responsive trial brief. They do not change the Court's conclusion regarding the tracing issue. Mr. Stevanovich testified that throughout the period when the "Master Funds loaned funds to PL, the Master Funds received cash from various sources, including returns from hundreds of investments unrelated to Loan Transactions" and from "new investors." SGS (10/30/23) Decl. ¶ 8; *see also* D-003 (showing funds received by Epsilon Global Master Fund II, L.P. from new investors and from sales of investments in 2003); Stevanovich Reply Br. 5 (Doc. 281). And Defendants have argued that Murray's calculations are not persuasive because she merely estimated amounts attributable to interest payments on PL Ltd. loans. Defs.' Resp. Trial Br. 30–31; *see also* Stevanovich Reply Br. 5–7 (asserting a litany of challenges to the persuasiveness and accuracy of Murray's evidence regarding tracing). These criticisms do not undermine the persuasive value of Murray's tracing analysis.[15] Indeed, Murray accounted for funds obtained from other sources when tracing funds from PL Ltd. to the Funds, the Management Companies, and ultimately to

---

[15] The Court also finds that Mr. Stevanovich's testimony in his trial declaration regarding fees and expenses for the Management Companies does not undermine the Trustee's showing on tracing of funds. Mr. Stevanovich testified in his declaration that "[t]he Management Companies applied the fees received to pay office rent for multiple locations, employee payroll, compensation for employees, and general business expenses," and that they "shared fees received to pay third party brokers who assisted the Management Companies in locating new investors." Stevanovich Decl. ¶ 5. However, Mr. Stevanovich makes no reference to any documentary evidence to corroborate this testimony or quantify the amounts of any such fees. This testimony also lacks significant persuasive value because the record elsewhere indicates that Mr. Stevanovich characterized the offshore Management Companies' income as "pretty much all net income." J-222.

Mr. Stevanovich. Murray is a qualified expert to offer such opinions, and the evidence reflected in Murray's trial declaration and accompanying expert report are both credible and persuasive.

Next, Mr. Stevanovich suggests that the Trustee has not met his burden to show that Stevanovich was a subsequent transferee because the money he received from the Management Companies was not a straightforward distribution of fees, but a salary. Defs.' Resp. Trial Br. 30–31 & n.62 (asserting that the Trustee "cannot recover compensation paid to Stevanovich earned in the regular course of his role as managing principal of the Management Companies" and citing *Roselink Investors, LLC v. Shenkman*, 386 F. Supp. 2d 209, 227 (S.D.N.Y. 2004)); *see also* Stevanovich Reply Br. 3–4 (citing Doc. 45 at 7). Defendants do not point to any records, testimony, or other evidence to support the assertion that all Mr. Stevanovich received from the Management Companies was a salary compensating him for his labor. Instead, when asked how he was compensated for his work and ownership of the Defendant entities, Mr. Stevanovich testified that "after I pay all the expenses of the investment advisors, investment managers, what's left comes to me." SGS Tr. (6/15/12) 51:12–18.[16] That characterization is far more consistent with Mr. Stevanovich being a subsequent transferee than a salaried employee.

Finally, their Opening Trial Brief, Defendants did not address the issue of tracing other than to "refer to and incorporate by reference their Summary Judgment Motion dated

---

[16] Defendants also assert that if the Court disagrees with their position, the Court should find that the Trustee is "only . . . entitled to any difference between the market interest rate and the excessive interest rate, if any." Defs.' Opening Trial Br. 50; *see also* Defs.' Resp. Trial Br. 29. Defendants provide no support for this assertion, nor any means to calculate this delta.

February 28, 2020, and the supporting Memorandum of Law, Declarations and accompanying exhibits filed on the same date." Defs.' Opening Trial Br. 49 (Doc. 256). Similarly, in their Response to Plaintiff's Opening Brief, Defendants again "incorporate[d] . . . by reference" their arguments from the summary judgment briefing, including their assertions that: (1) the Trustee's tracing analysis could not establish that the management and performance fees received by the Management Companies originated solely from money received from PL Ltd.; (2) Plaintiff's expert witness, Murray, did not perform a tracing analysis, but instead made "calculations" that are insufficient to trace funds from PL Ltd. to the Management Companies or Mr. Stevanovich; and (3) Mr. Stevanovich was paid compensation in his role as managing principal of the Management Companies, which is not recoverable through a tracing of funds. Defs.' Resp. Trial Br. 30–31 (Doc. 266).[17]

The Court declines Defendants' implicit invitation to sift through its summary judgment briefing and craft for them trial arguments regarding the adequacy of the Trustee's evidence of tracing. It is for Defendants, not the Court, to frame the issues they believe the Court needs to resolve, and their method of incorporation by reference of summary judgment issues is insufficient. "Adopting by reference arguments in documents

---

[17] After incorporating these three summary judgment arguments by reference, Defendants raise a fourth argument concerning Murray's purported failure "to account for other factors that demonstrate her estimates and calculations are not accurate." Defs.' Resp. Trial Br. 31. But Defendants include no cites to the record in support of this argument, and the Court will not search for such evidence on their behalf. The Court notes that United States District Judge Eric C. Tostrud reviewed the summary judgment record and the parties' briefing and found Defendants were not entitled to judgment as a matter of law based on alleged flaws in the Trustee's approach to tracing funds from the Funds to the Management Companies and Mr. Stevanovich. Summ. J. Order (June 10, 2020) (Doc. 65). To the extent that Defendants ask the Court to reconsider any aspect of Judge Tostrud's summary judgment ruling, this Court declines to do so.

other than in the brief dealing with the particular point under consideration not only provides an effective means of circumventing the page limitations on briefs . . . but unnecessarily complicates the task of the . . . judge." *Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18 C 8175, 2024 WL 3888772, at *7 (N.D. Ill. Aug. 20, 2024) (quoting *Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590, 592–93 (N.D. Ill. 2013) (cleaned up); citing *Hudgins v. Total Quality Logistics, LLC*, No. 16 C 7331, 2024 WL 1618363, at *6 (N.D. Ill. Apr. 15, 2024)); *see also Tedrow v. Franklin Twp. Cmty. Sch. Corp.*, 674 F. Supp. 3d 494, 515 (S.D. Ind. 2023) ("By improperly seeking to incorporate arguments made elsewhere again, Mr. Tedrow waives any argument on this point."). Accordingly, the Court finds the arguments defendants attempted to incorporate by reference to be waived. *Kove IO, Inc.*, 2024 WL 3888772, at *7.

In any event, the Court has conducted a cursory review of the Defendants' summary judgment briefing and the evidence cited in support of that motion. These materials do not change the Court's conclusion that the Trustee has met his burden to trace transfers from the Master Funds to both the Management Companies and Stevanovich.

### C. Conclusion

The Court concludes that the Trustee has carried his burden to prove the elements of the fraudulent-transfer claims by a preponderance of the evidence. Having so found, the Court turns to the Defendants' affirmative defense that they received transfers in good faith and for reasonably equivalent value.

### III.    Good Faith Defense

For Defendants to prevail on their good-faith defense, they must prove by a preponderance of the evidence that they received the transfers at issue in good faith and for reasonably equivalent value. The Court concludes that Defendants have not made the requisite showing because they have not demonstrate the transfers were received in good faith. As a result, even assuming they received reasonably equivalent value, they cannot prevail on this affirmative defense.[18]

### A.  Legal Standards

Although the Court already noted general parameters of a good-faith defense, some further exploration of the standards is needed. "A finding of good faith is primarily a factual determination. . . ." *In re Armstrong*, 285 F.3d 1092, 1096 (8th Cir. 2002). "To determine whether a transferee acts in good faith, courts look to what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint." *Sherman*, 67 F.3d at 1355 (internal quotations omitted). "In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *Id.*; *Zayed v. Buysse*, No. 11-cv-1042 (SRN/FLN), 2012 WL 12893882, at *22 (D. Minn. Sept. 27, 2012) ("The question of good faith consists of two parts: (1) whether the transferee was on inquiry notice of the

---

[18] *In re Agricultural Research and Tech. Gr., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990) ("Even if the transferee gave reasonably equivalent value in exchange for the transfer . . ., the transferee may not recover such value if the exchange was not in good faith because good faith is 'indispensable' for the transferee who would recover any value given pursuant to 11 U.S.C. § 548(c), the equivalent of [Hawaii's fraudulent transfer statute].").

transferor's fraud or insolvency; and, if so, (2) whether the transferee conducted a diligent investigation.").

When evaluating whether a transferee knew or should have known of either the debtor's insolvency or the fraudulent purpose of the transaction, courts ask whether "the transaction carries the earmarks of an arms-length transaction," *Sherman*, 67 F.3d at 1355 (quoting *In re Robbins*, 91 B.R. 879, 886 (Bankr. W.D. Mo. 1988)), and whether "any facts, or 'red flags,' exist, sufficient to cause a reasonable person to inquire further," *Zayed*, 2012 WL 12893882, at *22. If the transferee is aware of signs that a debtor is insolvent or making a transfer for a fraudulent purpose, the transferee has an obligation to "diligently investigate." *Zayed*, 2012 WL 12893882, at *22 (citing *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)* ("*Bayou IV*"), 439 B.R. 284, 312 (S.D.N.Y. 2010)); *Sherman*, 67 F.3d at 1357 ("If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge.").

With these standards in mind, the Court considers the evidence concerning both the existence of "red flags" that put the Defendants on inquiry notice and Defendants' alleged due diligence. The Court concludes that the Management Companies and Mr. Stevanovich have failed to show that they received the transfers from PL Ltd. in good faith.

## B. The So-Called "Kelley Admission"

Defendants first argue they acted in good faith because the Trustee admitted that, throughout the period of Defendants' lending to PL Ltd.e, Mr. Stevanovich "was unaware

of any fraud being perpetrated by Petters," and that he had engaged in conduct indicating a diligent investigation of the purchase-order-financing investment opportunity with Petters' businesses. Defs.' Opening Trial Br. 38–39. To support this position, Defendants point to statements made by the Trustee in support of a motion for approval of the parties' settlement agreement filed in October 2014 in the bankruptcy adversary proceeding. D-001 at 18–19, ¶¶ 37–38. The effort at settlement ultimately failed, and the Trustee withdrew the settlement after the Trustee determined that Mr. Stevanovich had failed to provide required documentation. Kelley Decl. ¶ 15 (Doc. 264); *see also* Lamb Decl., *passim* (explaining the rationale for withdrawing from the settlement agreement) (Doc. 265).[19]

Although Defendants essentially equate several statements in the withdrawn motion as concessions of key facts by the Trustee, the Court is not persuaded for at least two reasons. First, the Trustee's purported admission does not negate the substantial evidence provided by the Trustee showing that the Management Companies and Mr. Stevanovich had actual knowledge of several facts placing them on inquiry notice that PL Ltd. was insolvent or was engaged in fraud.

Second, and more importantly, the statements were made in a motion for approval of a settlement agreement. The Trustee did not make the purported admissions in any stipulation of facts for purposes of trial, and that context is important. In the very motion

---

[19] Although Mr. Stevanovich takes issue with the accuracy of statements in these declarations concerning the circumstances that led to the withdrawal of the motion for approval of the settlement, Stevanovich Reply Br. 2–5, the motion itself indicates that it was the Trustee's unilateral prerogative to withdraw the motion, D-001 ¶ 39 (allowing the Trustee to withdraw the motion if a review of documentation "uncovers information that materially changes the Trustee's understanding of the Settling Defendants' past and current financial condition").

on which Defendants rely, the Trustee stated that he believed he would prevail at trial. The Trustee also expressly reserved the right to withdraw the motion for approval of the settlement if he determined that Defendants did not live up to their end of the bargain. *See* Kelley Decl. ¶¶ 13–14; D-001 ¶¶ 25, 39. These assertions would make little sense if the Trustee's statements were to function as a concession on central aspects of the good-faith defense. Consequently, the Court finds that the so-called "Kelley Admission" is not probative of the material facts at issue in this case.[20] Moreover, even if the statements in support of the withdrawn motion for approval of the settlement are considered a relevant evidentiary data point on the issue of Defendants' good faith, they are not particularly persuasive.[21]

## C. Red Flags and Due Diligence

The Trustee argues the evidence establishes the existence of several "red flags" at the very outset of Defendants lending relationship with Petters' businesses, and other facts came to light during the relationship that also placed Defendants on inquiry notice.

---

[20] Because of these conclusions, the Court does not resolve the Trustee's alternative argument that the statements contained in the withdrawn motion for approval of the settlement are inadmissible under Federal Rule of Evidence 408.

[21] In addition to the so-called Kelley Admission, Defendants argue that the Securities and Exchange Commission similarly concluded that Stevanovich was unaware of any fraud being perpetuated by Petters "when it decided no enforcement action would be taken against Defendants." Defs.' Opening Trial Br. 8. However, the SEC letter on which Defendants rely does not say that Stevanovich had no knowledge of the fraud Petters was perpetuating through PCI and PL Ltd., disclaimed any exoneration of Defendants, and warned that use of the letter as a defense in a civil action would be improper. D-002 at 4 (stating that even where the SEC informs a person being investigated that no enforcement proceeding will be initiated, "it must in no way be construed as indicating that the party has been exonerated" and that "[t]he attempted use of such a communication as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally, would be clearly inappropriate and improper").

According to the Trustee, despite being on inquiry notice, Defendants ignored these red flags and failed to conduct any reasonably diligent investigation that would have led to the discovery of the fraud or convinced a reasonable lender to stop making the loans. Defendants disagree, arguing that they were unaware PCI and PL were engaged in fraud or insolvent, and they conducted a reasonable investigation prior to making the loans. Further, Defendants assert that when issues arose during the lending relationship, they responded promptly and appropriately. Ultimately, the Court finds that Defendants have failed to carry their burden to prove they received transfers in good faith.

### 1. Arthur Andersen

Defendants argue that their retention of Arthur Andersen demonstrates their good faith both because it shows no red flags actually existed and because it is evidence of their due diligence. Defs.' Opening Trial Br. 41–42. Defendants point to Mr. Stevanovich's testimony that EIM, one of the Management Companies, retained Arthur Andersen "to provide due diligence," which included a request for verification that PCI received payments from Costco Wholesale Corporation for transactions completed during the fiscal year 2000 and that PCI was current on its obligations to creditors as of the date of the investigation. SGS (10/30/23) Decl. ¶ 17. According to Mr. Stevanovich, the Arthur Andersen report "did not note any irregularities." *Id.* ¶ 18. Further, Defendants argue that while the report included several disclaimers, there was no language indicating that the interest rates for the loans "suggested anything out of the ordinary." Defs.' Opening Trial Br. 44–45. Thus, Defendants suggest that they were not on inquiry notice because the

Arthur Andersen report made it appear the lending opportunity with Petters' diverting business was a sound and legitimate investment.

The Court concludes that Defendants' retention of Arthur Andersen and receipt of the Arthur Andersen report do not support their good-faith defense. First, the report and the inquiry on which it was based were limited in scope. As Mr. Stevanovich admitted, Defendants did not ask Arthur Andersen to conduct an audit of Petters' diverting-goods business. Indeed, the evidence establishes that Defendants never requested an audit of PCI from Arthur Andersen, or anyone. Further, recited in detail above, Defendants limited the scope of the Arthur Andersen report to the specific inquiries they asked Arthur Andersen to perform. The report itself notes the limitations Defendants placed upon Arthur Andersen's work, and the company conducted no audit or review in connection with applicable standards. Arthur Andersen only interviewed a handful of key personnel, conducted no detailed analysis of PCI's financial statements, and made no effort to verify information PCI provided to Arthur Andersen. Arthur Andersen expressed no opinions about the validity of PCI's financial reporting and could not assure Defendants about the accuracy and completeness of the financial information that it used in generating the report. As a result, "[t]he minimal report by Arthur Andersen did not do enough under any of the applicable due diligence principles." Sept. 12, 2022 Order (adopting proposed finding 5(e)).

Second, Defendants overstate the Arthur Andersen report when they suggest it found no irregularities. In the report, Arthur Andersen said it found instances in which Petters did not make payments to the vendors for the goods purportedly received, but still appeared to

receive payments from the vendors' customers. The report also noted Arthur Andersen was unable to match cash receipts on an aging report to cash receipts on bank statements. Arthur Andersen made it clear it was unable to verify any of the explanations Petters offered for such irregularities. And although the Arthur Andersen report suggested that Defendants should obtain audited financial statements from PCI if they decided to go forward with the purchase-order financing, there is no dispute that Defendants never asked for audited or unaudited financial statements.

To the extent Defendants argue that the Arthur Andersen report affirmatively shows Defendants were aware of no red flags or negates other evidence showing Defendants were on inquiry notice, the Court concludes otherwise. And to the extent Defendants suggest that their retention of Arthur Andersen and receipt of its report demonstrate that Defendants responded appropriately to any red flags, they have failed to meet their burden to show good faith.

### 2. GE Capital and Petters' Business Success

Defendants also emphasize that GE Capital, a sophisticated lender, had invested with PCI. Mr. Stevanovich testified that "EIM ran UCC lien searches which revealed creditors, including General Electric Capital Corporation ("GE Capital") who was known in the industry for its extensive credit due diligence, that were lenders to Petters' diverting goods business," and the fact that other sophisticated lenders were loaning money to PCI "gave us additional comfort in extending their credit." SGS (10/30/23) Decl. ¶ 19. In deciding to make loans to Petters' businesses, Stevanovich relied on the fact that Petters appeared outwardly to be a "successful businessman." Further, Mr. Stevanovich testified

that because Ted Mondale was working for Petters, this "bolstered Petters' credibility in [Stevanovich's] eyes." *Id.* ¶ 20; *see also id.* ¶¶ 33–34 (explaining that Mr. Stevanovich followed Petters' other apparently successful business ventures).

These facts do not establish Defendants received transfers in good faith—they neither negate the evidence showing Defendants were on inquiry notice, nor show that Defendants conducted proper due diligence in the face of red flags. As the Court has already found, "[m]ere comfort from the presence of other lenders in the debt structure of a prospective borrower does not constitute due diligence. . . ." Sept. 12, 2022 Order (adopting proposed finding 5(i)). Therefore, just because Mr. Stevanovich was aware that GE Capital made similar loans at one time does not mean Defendants conducted a reasonably diligent investigation in response to any facts placing them on inquiry notice. Nor does the fact that Mr. Mondale worked for Petters demonstrate Defendants received transfers in good faith once they became aware of red flags.

In fact, the details of GE Capital's lending history with PCI undermines Defendants' good-faith defense. In the summer of 2000, before Defendants received any transfers from PCI or PL Ltd., GE Capital stopped lending money to PCI. Later investigation revealed that GE Capital made that decision after it called Costco directly to verify outstanding purchase orders. At that point, GE Capital learned that there were no purchase orders underlying the transactions. But the evidence shows that after Stevanovich learned that GE Capital ceased lending to PCI, neither he nor any other agent of the Defendants contacted GE Capital to inquire about the reasons GE Capital did so. There is no dispute that Defendants knew GE Capital had stopped lending to Petters, nor that Defendants made no

effort to figure out why. Instead of taking comfort in GE Capital's presence on the creditor list, the Defendants ought to have been concerned regarding their departure.

Moreover, the Court concludes that the evidence supports the inference that, if Defendants had contacted GE Capital, called the diverting vendors, or called any of the retailers allegedly paying PCI and PL Ltd., Defendants would have very likely discovered there were no legitimate transactions underlying the loans. True, there is no evidence establishing definitively what GE Capital would have told Defendants if they reached out to GE Capital to ask why it stopped financing Petters' businesses. But if Defendants had contacted any of the big-box retailers purportedly buying the diverted goods, they certainly would have discovered the lack of any actual transactions. And Defendants admit they did not make any such inquiry even though, as discussed in more detail below, they knew Petters was paying unreasonably high interest rates for the type of transactions at issue and that he had insisted Defendants make no direct contact with purported vendors or retailers.

Accordingly, the Court finds that both GE Capital's involvement and Mr. Mondale's employment with Petters fail to provide any support for their good-faith defense.

### 3. Unreasonable Interest Rates

The parties dispute whether Defendants' knowledge of interest rates for their loans to PCI and PL Ltd. placed them on inquiry notice of the fraud. Those loans overwhelmingly promised annual interest rates between 36 and 48 percent. Such remarkably high interest rates were present from the outset of the lending relationship between Defendants and Petters' businesses. The first loan had an annualized interest rate of 36 percent, and the next five had an annualized interest rate of 48 percent. Over time, Petters lowered the interest

rates to a point where the median was 30 percent, but only the very last loan had an interest rate below 18 percent. Further, the evidence shows the purchase-order financing transactions that the loans ostensibly funded were low-risk.

The Court agrees with the Trustee that these very high interest rates placed Defendants on inquiry notice. Aside from observing that other investors were receiving similar interest rates, Defendants point to no evidence explaining why the rates could ever be commercially reasonable. Defendants moved forward with the loans even thought they would be obtaining returns that more than doubled the Funds' investing goals. It is undisputed that the interest rates on Defendants' loans considerably exceeded the returns the Master Funds' investment managers targeted, which were in the "high-teens, low-20-percent for returns on investments." UF-35.

Further, Mr. McKinley persuasively explained how such high rates did not bear a reasonable relationship to the underlying transactions Defendants were ostensibly financing. This is because the big-box retailers with whom Petters said he was conducting the diverting business possessed too much market power to pay prices for PCI's goods high enough to generate enough profit to justify such a high interest rate.[22] Mr. Martens testified

---

[22] Defendants argue that the interest rates on their loans did not constitute a red flag because McKinley testified that he was personally involved in three purchase-order-financing transactions with annualized interest rates of 36 percent, a rate that he characterized as "customary." McKinley (12/14/11) Tr. 962:6–16. Defendants ask this testimony to bear more weight than it can sustain. Defendants make no effort to explain how this testimony undermines McKinley's persuasive explanation of why rates between 36 and 48 percent were commercially unreasonable for the types of purchase-order-financing transactions that *Defendants* were engaged in. In addition, there is no evidence in the record that the three transactions McKinley's company financed in 2010, several years after Defendants ceased lending to PL Ltd., were at all similar to the purported deals Defendants' financed for Petters.

that such unreasonably high interest rates were consistent with those of other Ponzi schemes, higher interest rates usually correspond to a higher risk to the lender, and the loans Defendants made to PCI and PL Ltd. were low-risk transactions like those involved in typical purchase-order financing. In addition, Martens explained that the gradual lowering of interest rates was an indication of fraud because high interest rates are needed "to lure initial investors into a Ponzi scheme but over time, as returns are generated, the investor gains confidence in the investment scheme and will accept a lower rate of return." Martens Decl. ¶ 15; Martens Tr. 189:24–190:17 (explaining that starting with high interest rates, with a gradual decrease over time was indicative of a fraud). Defendants do not point to any persuasive evidence—e.g., changes to the nature of the transactions purportedly underlying the loans or renegotiating the terms—that might otherwise why the rates started so remarkably high but decreased over time.

In other words, from the outset of the lending relationship at issue here, the interest rates Defendants were promised appeared "too good to be true." *See In re Bernard L. Madoff Investment Securities LLC*, 515 B.R. 117, 141 (Bankr. S.D.N.Y. 2014) (listing red flags of which the defendant was aware, including that "returns were too good to be true and lacked any correlation to the performance of the S&P 500"); *see also Zayed*, 2012 WL 12893882, at *32 (finding defendants not entitled to summary judgment where investments in fraudulent enterprise involved "relatively high rates of return"). Rather than take steps to investigate whether the interest rates were commensurate with the loans they were providing, Defendants forged ahead with the arrangement.

Defendants argue that the interest rates did not constitute a red flag because the Master Funds negotiated the interest rates "at arms-length with PCI and PL." They further assert that Mr. Stevanovich "negotiated the interest rates based upon his credit analysis of what was appropriate for the type of purchase order financing that was being offered and seeing the interest rates that Arthur Andersen reported PCI was paying to other lenders. . . ." Defs.' Opening Trial Br. 44. However, Defendants do not point to evidence detailing the nature of any such negotiation over interest rates. And other evidence demonstrates that "Petters arbitrarily selected interest rates" offered to lenders. Coleman Decl. ¶ 45.

Similarly, Defendants provide no evidence to support the suggestion that the interest rates Defendants received were consistent with market rates for purchase-order financing. Instead, Defendants point only to excerpts of the Arthur Andersen report that identified monthly interest rates that PCI was charging to other lenders, but nothing suggests that Arthur Andersen opined that these were market rates. Finally, while Defendants argue that the interest rates promised were reasonable because they "could see that PCI was making money as the deal was structured because there was margin above and beyond repaying the loans," Defs.' Opening Trial Br. 43, they do not point to evidence to support that assertion. Nor do they dispute that they did not request and did not receive audited financial statements or unaudited monthly GAAP financial statements from PCI or PL Ltd. that would have confirmed or undermined that supposition.

### 4. Retention of Counsel

Defendants also contend that their retention of counsel in connection with the loan transactions demonstrates that they received transfers in good faith. Defendants retained counsel from the Oppenheimer firm to represent them in connection with the transactions, and their attorneys never raised any concerns regarding Petters being engaged in fraud or being insolvent. Defs.' Opening Trial Br. 44, 47; Defs.' Resp. Trial Br. 17, 21. The Trustee argues that Defendants cannot rely on any advice-of-counsel defense because (1) they did not plead such an affirmative defense in their answer; (2) they did not make the required disclosures of information related to such a defense during discovery and did not waive attorney-client privilege; (3) they could not establish such a defense because they have not shown that they made all material disclosures of fact to their attorneys and were advised that their conduct was appropriate; and (4) the mere fact that counsel was involved in the transaction is insufficient to establish the defense. Pl.'s Reply Br. 27–28.

The precise nature of Defendants' position on the significance of their retention of counsel is somewhat hard to pin down. It is unclear whether Defendants are, in fact, attempting to assert a full-blown advice-of-counsel defense, but if they are, the Court finds that the Trustee has the better of the argument. Defendants neither plead this defense, disclosed evidence of the information they provided to their attorneys to obtain an opinion on the legitimacy of Petters' business, nor waived the attorney-client privilege. Generally, under Minnesota law, "an advice-of-counsel defense . . . requires the defendant to establish that he or she fully disclosed all material facts tot eh attorney, received advice that his or her conduct was legal, and acted in good-faith reliance on that advice." *Sysdyne Corp. v.*

*Rousslang*, 860 N.W.2d 347, 354 (Minn. 2015). By failing to raise the defense in a pleading, failing to waive the attorney-client privilege as required for assertion of the defense, and failing to prove the facts necessary to establish the defense, Defendants cannot now suggest they acted in good faith because their attorneys advised them there was no concern that PL Ltd.'s and PCI's diverting business was fraudulent or that Petters' companies were insolvent.

It appears more likely that Defendants are not asserting a true advice-of-counsel defense, but rather arguing their retention of a reputable law firm mutes the impact of the Trustee's evidence that various red flags existed. However, even viewed through this lens, the involvement of counsel in connection with the transactions is not persuasive evidence that Defendants received transfers from PCI and PL Ltd. in good faith. As explored below, Defendants do not point to evidence showing they engaged Oppenheimer to investigate the legitimacy of the Petters diverting business prior to making the loans or whether PCI or PL Ltd. were solvent. Nor do Defendants show that, after they began lending to Petters' businesses, either they or their counsel conducted any investigation when other irregularities arose.

### 5. Secrecy

The Trustee asserts that Petters' insistence on secrecy was a red flag, placing Defendants on notice of potential fraud. Petters would not allow Defendants to contact any participants in the transactions—either retailers or vendors—nor did he permit Defendants to inspect merchandise. Petters did not provide Defendants audited financial statements, despite the MLA's provisions entitling Defendants to obtain them.

Defendants acknowledge that Petters "demand[ed] . . . heightened discretion," and there is no dispute that Petters insisted they make no contact with the retailers or vendors involved in purchasing and selling the diverted goods because "[h]e did not want the retailers or vendors to become spooked and refuse to consummate the transactions." Stevanovich Decl. ¶ 15. Mr. Stevanovich testified he and Greg Bell did not contact Sam's Club and Costco at Petters' request, but they visited the retailers and confirmed they sold the types of goods ostensibly involved in the diverting business. *Id.* ¶ 16. He also refers to his "understanding that Sam's Club and Costco were not 'authorized sellers' of the products," which he states "was another reason for confidentiality." *Id.*; *see also* Defs.' Opening Trial Br. 42–43.

The Court concludes that the insistence on secrecy by Petters placed Defendants on inquiry notice even before Defendants began lending to PCI and PL Ltd. In addition, even though such a demand for secrecy should have raised questions in a supposedly lawful business arena, Defendants did not conduct a diligent investigation to determine if the diverting business was legitimate. Instead, Defendants blindly accepted the rationale for confidentiality that Petters offered.

Not only does the Defendants' position somewhat defy common sense, but the Trustee's position that the secrecy demands should have set off alarm bells finds substantial support in Mr. McKinley's credible and persuasive testimony concerning the core principles of purchase-order financing. For example, McKinley explained that it is unreasonable for a lender to fail to verify a purchase order with a vendor. McKinley Tr. (12/14/11) 941:4–10; McKinley Decl. ¶ 16. Because Petters prohibited Defendants from

contacting vendors, Defendants were unable to ever verify the legitimacy of any the transactions. Similarly, the prohibition on Defendants contacting the retailers purchasing the goods prevented Defendants from fully exercising control over the funds with which they were to be paid, a step that can mitigate the possibility of fraud, and that was supposed to be part of these transactions, though it was not. McKinley Tr. (12/14/11) 946:6–23; McKinley Decl. ¶¶ 18–19. McKinley's testimony further supports the conclusion that if Defendants had adhered to the core principles of purchase order financing, they would have discovered that the Petters business model was entirely fraudulent. McKinley Decl. ¶ 20. Contacting the vendor as a means of controlling the movement of goods would have revealed no goods were sent to a freight company or common carrier, and contacting retailers to insist on direct payment to Defendants' own accounts, such as their lockbox account at Highland Bank, would have brought down the house of cards. *Id.* ¶ 21. Defendants' explanations for why they accepted Petters' demands for secrecy offer no compelling rationale for their actions and are unpersuasive on the issue of good faith.[23]

In the face of the secrecy insisted upon by Petters, Defendants chose to disregard the reasonable suspicions raised by those constraints, elected to forego further investigation, and opted to move forward with the lending opportunity. The most

---

[23] Although it is their burden to establish the good-faith defense, Defendants point to no specific evidence supporting their insistence that no other lenders demanded audited financial statements, required that they be allowed to contact retailers or vendors, or inspected merchandise. *See* Defs.' Opening Trial Br. 42–43 (stating that no investor required audited financials, "all investors accepted" Petters' explanation for confidentiality, and no investor inspected merchandise). Nor do Defendants point to caselaw supporting the argument that a party acts in good faith as long as it behaves in the same manner as other transferees.

compelling inference to be drawn from these facts is that Defendants preferred to move forward because the promise of obtaining a high rate of return was alluring enough that they were willing to ignore a suspicious demand for secrecy. That is inconsistent with Defendants' good-faith defense.

### 6. Late Payments

The Trustee argues another red flag was raised when a significant number of loans were repaid by PCI and PL Ltd. well after their due date. Defendants attempt to minimize the significance of this evidence, arguing that the Trustee exaggerates the number of late payments, and Defendants emphasize that several of the loans that were repaid late were only delinquent by a few days. Defs.' Opening Trial Br. 47. In support of this argument, Mr. Stevanovich testifies: "There were a few times when PL loan payments were late. However, this was rare and the payments were only a few days late, which did not cause us concern." Stevanovich Decl. ¶ 30.

The Court concludes that the late payments placed Defendants on inquiry notice, and Defendants did not take reasonable steps once those red flags arose. Late payments and bounced checks can constitute red flags. *Sherman*, 67 F.3d at 1355 (affirming the bankruptcy court's finding that the Shermans were on inquiry notice where, among other things, "the Shermans were aware that the debtors were behind in mortgage payments to the Bank"); *In re M&L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1338–39 (10th Cir. 1996) (affirming conclusion that transferee did not receive in good faith where the first check was returned). True, PCI and PL Ltd. repaid only a relatively small percentage of the total number of Defendants' loans after they were due. But the very outset of the lending

relationship was marked by such delinquent payments. This would have caused a reasonable lender to take additional investigative steps or other action before continuing with additional loans.[24]

Defendants did not take further investigative steps or conduct other diligence after the first loan was repaid over a month late, and then with a bounced check. They forged ahead with further loans even though Mr. Stevanovich indicated that the first loan to PCI was made for the purpose of "test[ing] the waters." The transactions must have failed the test, but Defendants were undeterred. Defendants similarly did nothing after PCI and PL Ltd. repaid the second and third loans late. Nor did Defendants act when PL Ltd. repaid an additional ten notes after the due date over the course of the lending relationship. Defendants never demanded that PCI or PL Ltd. fulfill their contractual obligations to pay penalty interest for any of these delinquent repayments. Defendants never invoked their contractual rights to review monthly GAAP financial statements pursuant to the MLA. They do not point to any evidence that they asked their attorneys at Oppenheimer to investigate the late payments. Nor did they ever demand direct repayment from the retailers to their lockbox account at Highland Bank as required by the contracts with PL Ltd. Defendants offer no cogent explanation for why they took no action other than to move forward with additional loans even after all of the first three loans were repaid late. Given Petters' demands for secrecy, the late payments were certainly a red flag for insolvency or fraud. Knowing what they did from the outset of the relationship, a reasonable lender in

---

[24] And although the payments were sometimes mere weeks or days late, the loan terms themselves were relatively short. A week's delinquency stands out sharply in a loan term of twelve weeks.

Defendants' position either would have known or should have known there was a substantial possibility the borrower was insolvent, or the transactions were not what they purported to be.

### 7. Paperwork Irregularities

The Trustee argues that Defendants were also on inquiry notice because PL Ltd. provided "error-riddled" paperwork to Defendants in connection with many of the loans. Defendants disagree that this constitutes a red flag and assert that they responded reasonably to these errors. Defendants argue that each time the irregularities referred to by the Trustee appeared in the paperwork, their attorneys brought them to the attention of PCI and PL, and they took action to make sure that errors were corrected.

The Court concludes that the frequent irregularities in the paperwork underlying the loans were a red flag, and Defendants response to that red flag was not a diligent investigation. The Court has already found that inaccuracies appeared on the face of proffered ostensible purchase orders, various communications contained discrepancies regarding PCI's required equity interest in the transactions, and Mr. Stevanovich and his Funds noticed such inaccuracies from 2002 to 2005. Sept. 12, 2022 Order (adopting proposed finding 6(b)). With respect to the purchase order irregularities, Judge Kishel's Substantive Consolidation Order accurately summarizes the evidence:

> 1. Amir Emami monitored the note transactions on an ongoing basis. [Emami Tr. (12/14/11) 747:5-24.] By at least October 2002, Emami noticed that various purchase orders from Petters conflicted with each other. [J-017.]

2.  In a 2003 email, Epsilon's attorney alerted Coleman that a particular purchase order erroneously listed Thousand Lakes as the issuer instead of PL. [J-021.]

3.  In a 2004 email, Epsilon's attorney asked Coleman to "edit" another purchase order that had erroneously listed an issuing entity other than PL. [J-022.]

4.  In a February 2005 email, the attorney again asked Coleman to revise a purchase order to make PL the issuing party rather than PCI. [J-025.]

5.  In July 2005, the same attorney asked for the same revision regarding a purchase order issued to Enchanted. [J-029.]

6.  In a January 2005 email to Robert White, Epsilon's attorney noticed that the purchase order from the ostensible retailer-customer (Sam's Club) to PCI did not match the corresponding purchase order from PL to Nationwide (the ostensible vendor). [J-024.]

7.  In a February 9, 2005 email, the Epsilon attorney noticed another discrepancy between the Item Number on the purchase order issued from PL to Nationwide and the Item Number on the purchase order issued from BJ's (the ostensible retailer-customer). [J-026.]

8.  The attorney brought the same concern to Coleman's attention on February 28, 2005. [J-029.]

9.  In another email, the attorney continued to note various discrepancies between the items listed on purchase orders to the ostensible vendor and the items listed on the corresponding purchase orders from the ostensible retailer. [J-030.]

10. Emails of this sort continued to go from Epsilon's attorney to Coleman until at least October 24, 2006. [J-034–J-038.]

Substantive Consol. Order 90–91; *see also* J-027, J-031–J-033, J-048, J-067, J-069, J-070, J-072, J-073, J-074, J-076, J-077, J-078, J-080, J-082. Finally, the Court previously determined that there is no evidence that Defendants did anything but bring such inaccuracies in purchase-order documentation to the attention of Coleman and White. Sept. 12, 2022 Order (adopting proposed finding 6(d)).

There were also indications that PCI's ostensible equity participation in the PL Ltd. loan transactions may not have been as reported. The Court has already found that Mr. Stevanovich and the Funds noticed various discrepancies that called into question the actuality of PCI's equity or participation. Sept. 12, 2022 Order (adopting proposed finding 6(c)).[25] Again, Judge Kishel's Substantive Consolidation Order accurately describes the evidence in the record:

> PCI was usually required to have a 10-30% equity interest in the transactions. . . . [However,] in a May 2003 email, [Defendants'] attorney asked Coleman to fax him "evidence of Petters portion of the wire." [J-020.] In a September 2004 email, Epsilon's attorney noted discrepancies between the total cost of the vendor's goods and the total amount of the wired funds to purchase those goods, particularly the miscalculation of the funds to be wired from PCI. [J-055.] A similar discrepancy was noted in emails to Coleman in August and September of 2005. [J-031; J-032.]

Substantive Consol. Order 91–92; *see also* J-080. Defendants have not shown that they responded to these issues in any way other than pointing out the errors and asking Coleman and White to fix them.

Defendants argue that their actions demonstrate they "diligently followed up when there was a discrepancy in the paperwork and got the discrepancy resolved to the satisfaction of their legal counsel who never advised Defendants of any red flag." Defs.' Resp. Trial Br. 21. To support this argument, they note that Deanna Coleman testified at

---

[25] In addition to granting the Trustee's "law of the case" motion as to proposed finding 6(c), the September 12, 2022 Order erroneously included proposed finding 6(c) in the list of matters that the Court was not finding. Sept. 12, 2022 Order at 2 (Doc. 127). To the extent that Order suggests that proposed finding 6(c) was not adopted, the Court corrects that error here.

the December 20, 2011 hearing in the bankruptcy proceeding that whenever Defendants' attorney raised these issues, she tried to resolve them as quickly as possible to ensure that the Petters organizations' fraud was not discovered. *Id.* at 20–21. The Court is not persuaded that Defendants' response to noticing these frequent errors was reasonable or diligent under the circumstances. First, Defendants point to no evidence that they asked their attorneys to advise them about whether these errors created any cause for concern, so it is of little relevance that their attorneys "never advised [them] of any red flag." Second, Ms. Coleman did not interact solely with Defendants' counsel, but exchanged emails with Mr. Emami and Ms. Chee-Awai, which contradicts Defendants' suggestion that Coleman "dealt with Defendants' legal counsel . . . on these issues." *Id.* at 21. Defendants themselves knew that PL Ltd. was regularly providing purchase order documentation that did not accurately catalog the entities involved in the transactions, the goods being distributed, or the money being spent.

Third, and most importantly, the errors identified were not "small" issues, *see* Defs.' Resp. Trial Br. 21, but red flags that required more of a reasonable lender than simply asking Coleman (or White) to "fix" or "revise" the loan documentation. Instead, such mistakes would arguably have been impossible or very rare if the transactions had occurred as claimed with each participant actually playing its role. For instance, these facts suggested that purchase orders had not been issued by the correct entity, which should have been PL Ltd. Other errors were similarly significant, such as the discrepancies between the items purportedly being sent by a vendor and those being received by the retailer-customers. Defendants offer no evidence supporting their position that they had no

indication of a potential fraud being perpetrated when PL Ltd.'s and PCI's personnel were able to simply modify various loan documents at Defendants' request. These errors, the frequency with which they arose, and Coleman's ability to quickly fix the errors by herself without contacting other participants in the transactions would have undermined a reasonable lender's confidence in the legitimacy of the transactions. At a minimum, a reasonable lender would have exercised its contractual rights to inspect the merchandise, conducted some due diligence regarding the vendors (Nationwide and Enchanted),[26] or contacted the retailer-customers to ensure that the purchase orders were what they appeared to be.

### 8. Deviations from Contractual Requirements

The Trustee argues that Defendants were on inquiry notice because of the various ways that the loan transaction with PCI and PL did not conform to the parties' contractual arrangements. These deviations include: (1) never requiring payments to come directly from Retailer Customers; (2) failing to require PCI's production of unaudited monthly GAAP financial statements; and (3) ignoring the contractual requirement for PL to provide an opinion of counsel prior to the first loan; and others. According to the Trustee, Defendants knew about PL Ltd.'s noncompliance with its contractual obligations, but never

---

[26] In the face of these irregularities in purchase order documentation for vendors, Defendants present no evidence suggesting they conducted any investigation of Nationwide and Enchanted. As Coleman testified, Nationwide was "operated" out of an apartment in Los Angeles, CA, and Enchanted out of a car wash in Minnetonka, MN. Coleman Decl. ¶ 42. Had Defendants visited the site of either business, they would have realized that those offices were not a location where billions of dollars of electronics were stored and, at a minimum, begun to suspect these vendors were sham companies. *See* Rudman Tr. (3/2/21) 53:2–54:14; J-104; J-105.

enforced its rights under the MLA. Pl.'s Opening Trial Br. 65–66. Defendants contend that the "Loan Transactions were documented and structured to provide Defendants with security in the merchandise, legally isolate the merchandise from other creditors of PCI and PL, and require a corporate guarantee from PCI[.]" Defs.' Resp. Trial Br. 12.[27] But such security only worked if the contract provisions were actually utilized.

The Court concludes that the significant deviations from the contractual requirements and Defendants' decisions not to enforce their contractual rights placed them on inquiry notice that PL and PCI were engaged in fraud. The Court has already found that Defendants "allowed defaults under the Master Loan Agreement." Sept. 12, 2022 Order (adopting proposed finding 6(a) regarding allowing defaults of the MLA). Defendants present no evidence that they demanded strict compliance with the MLA. And the Court has found that, rather than relying on the separateness of PL from PCI as structure for the transactions, Defendants relied on the interrelatedness of PL with PCI. *Id.* (adopting proposed finding 4(a)). In particular, Defendants relied on the interrelatedness of PCI and PL for repayment of the loans, accepting without question that funds would be repaid even if they came from a source unrelated to the note and purchase order underlying a loan. J-018 (Coleman informing Chee-Awai that payment to Defendants would be made the following day even if none was received by National); J-019 (Emami requesting payment from Coleman even if no payment comes in from a retailer).

---

[27] Although Defendants argue that they acted in good faith based on the fact that they had guaranties from Petters and PCI for the loans made to PL Ltd., Defs.' Resp. Trial Br. 9–10, Mr. Stevanovich testified that Defendants did not rely on the guaranties, but considered them credit enhancements, SGS Tr. (12/14/11) 704:17–23.

Most importantly, Defendants, including Mr. Stevanovich,[28] knew that the payments they received in satisfaction of the loans did not come directly from the retailers as required by the MLA, but were instead coming from PCI.[29] Knowing that the retailers' supposed funds were not coming directly to the Highland Account, Defendants did not insist on compliance with that provision; nor have they provided evidence showing that they raised the issue with Coleman, White, or Petters. The most compelling inference to be drawn from the evidence is that Defendants were unconcerned with where the money was coming from so long as they were ultimately being repaid. The Trustee has shown that maintaining control or dominion over the funds from the ultimate purchaser is usually essential to a lender in a purchase-order financing arrangement. And Defendants admitted that the promise of having direct access to those payments was important to them. *See* Emami Tr. (8/3/2011) 101:2–8. Because they knew PCI and PL Ltd. never complied with that aspect of the arrangement, Defendants were alerted to a substantial possibility that their borrowers were engaged in an illegitimate business. Defendants should have conducted a thorough investigation and insisted on compliance with the MLA, rather than blindly continuing to loan millions to Petters' businesses.

---

[28] Mr. Stevanovich testified that he met personally with Petters during Defendants' lending activity, he exercised substantial control over Defendants' business decision, and he was involved in the decisions to waive requirements of the MLA and other loan documents. The most reasonable inference to be drawn from the evidence is that Stevanovich was personally involved in the decision to allow this arrangement to proceed.

[29] Defendants also ignored the fact that PCI or PL Ltd. never provided them written notification that they had informed the retailer-customers of the obligation to make payments directly to the Highland Bank accounts.

It is also remarkable that PCI never provided monthly financials to Defendants. Section 5.1(a) of the MLA plainly required PCI and PL Ltd. to provide such information to Defendants. And Arthur Andersen had advised Defendants to obtain audited financial statements as a condition of making loans. Defendants suggest that the MLA allowed them to "choose not to require" compliance with that covenant, and they made such a choice. Defs.' Resp. Trial Br. 21. But the MLA itself required Defendants to waive that provision expressly in writing. J-209 § 5.1(a). Defendants point to no evidence showing that they made such a written waiver. And even if they were free to waive a provision, doing so lessened their ability to verify the legitimacy of the transactions.

Moreover, Defendants never demanded access to PCI's bank records, as they were permitted to do under Section 5.5 of the MLA. Under the same provisions, Defendants could inspect any of PL or PCI's properties and any warehouse or location where inventory was stored. *Id.* § 5.5. Had Defendants exercised these contractual rights, they would have discovered that PCI and PL were not receiving funds from retailers at all, and they would have discovered that the inventory purportedly underlying the transactions was nonexistent. If, as Defendants contend, Petters would have refused to allow Defendants to access those records or conduct such inspections, that too would have been a signal that his diverting business was illegitimate. Indeed, the fact that the MLA gave the Defendants inspection rights that Petters simultaneously discouraged should have been an alarm bell itself.

The Court finds that a reasonable lender faced with these deviations from the parties' contractual arrangement would have taken steps to ensure that the transactions in which it

was investing were not a fraud. Instead, Defendants did nothing. Although Defendants suggest that they were motivated by the security and low-risk nature of the transactions as they were structured, the Trustee's showing is uncontroverted that Defendants chose to ignore PL Ltd.'s obvious non-compliance, and continued receiving transfers under circumstances suggesting fraud.

For all the foregoing reasons, the Court concludes that Defendants have failed to prove, by a preponderance of the evidence, that they received transfers from PCI and PL in good faith.

### D. Reasonably Equivalent Value

The parties also dispute whether Defendants have shown that they took the transfers for reasonably equivalent value. Much of this dispute arises around the parties' differing interpretations of decisions that have rejected a so-called "Ponzi scheme presumption" when considering reasonably equivalent value under MUFTA. These cases include the Minnesota Supreme Court's decision in *Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015) and the Eighth Circuit's in *Kelley v. Boosalis*, 974 F.3d 884 (8th Cir. 2020). As noted above, the Court does not reach these issues because it finds that Defendants have failed to carry their burden to show they received transfers in good faith. Nor does the Court address the Trustee's argument that a "Ponzi scheme presumption" still applies under federal law. Pl.'s Opening Trial Br. 60–61 (citing 11 U.S.C. §§ 548(c) and 550(b); citing cases).

## IV.    Safe Harbor

Defendants assert that the Trustee's claims are barred by a securities safe harbor provision in 11 U.S.C. § 546(e). *See* Defs.' Opening Trial Br. 48–49. The Court is not persuaded.

Section 546(e) provides that a trustee cannot "avoid a transfer . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency . . . in connection with a securities contract. . . ." 11 U.S.C. § 546(e). However, the statute expressly provides that it does not apply to actual fraud claims under 11 U.S.C. § 548(a)(1)(A). 11 U.S.C. § 546(e) (excepting actual fraud claims from the safe harbor provision). By contrast, section 546(e) does provide a defense to constructive fraud claims under 11 U.S.C. § 548(a)(1)(B). 11 U.S.C. § 546(e) ("Notwithstanding section[] . . . 548(a)(1)(B) . . . the trustee may not avoid a transfer. . . "). As noted above, the Trustee has explicitly elected not to pursue his constructive fraud claims and relies solely on actual fraud. Pl.'s Opening Trial Br. 25.

Defendants argue that they nevertheless are immune from the Trustee's claw-back claims in this case because the Trustee brings claims against the Management Companies and Mr. Stevanovich as subsequent transferees under 11 U.S.C. § 550. Defendants acknowledge that an initial transferee cannot rely on the safe harbor of section 546(e) when the trustee seeks to avoid initial transfers that are actually fraudulent under 11 U.S.C. § 548(a)(1)(A). But Defendants suggest that § 546(e) makes a subsequent transferee immune from a trustee's action under § 550 even when actual fraud claims are at issue. *See* Defs.' Opening Trial Br. 48; Corporate Defs.' Reply Br. 7 (Doc. 284). Therefore, according

to Defendants, the only claims that "survive are the direct, actual fraudulent transfer claims brought against the Master Funds under section 548(a)(1)(A)." Defs.' Opening Trial Br. 49.[30]

In support of this proposition, Defendants rely on *Kelley v. Safe Harbor Managed Account 101, Ltd.*, 31 F.4th 1058 (8th Cir. 2022). *Safe Harbor* does not support Defendants' position. Nowhere does *Safe Harbor* hold that a trustee cannot avoid actually fraudulent transfers to a subsequent transferee because § 546(e) only applies to initial transfers. Instead, the *Safe Harbor* court simply explained that "a subsequent transferee is protected indirectly to the extent that the initial transfer is not avoidable because of the safe harbor." 31 F.4th at 1064 n.5 (quoting *Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018)). What this means is that if § 546(e) would make the initial transferee immune, then a subsequent transferee could rely on the same § 546(e)

---

[30] Defendants also suggest that *Safe Harbor* supports a finding that the Trustee cannot avoid the subsequent transfers to the Management Companies and Mr. Stevanovich because the initial transfers to the Master Funds were made to "Goldman Sachs (which is clearly covered by section 546(e)), pursuant to a Note Purchase Agreement." Defs.' Opening Trial Br. 48–49 (footnotes omitted). The Court is not convinced. *Safe Harbor* carefully explores the way in which the bank (Wells Fargo) was involved in the transactions between the PCI subsidiary (MGC Finance) and the initial transferee (Arrowhead), and then the court explains how Arrowhead itself could qualify as a "financial institution" under the statutory definition's inclusion of a customer of a bank. 31 F.4th at 1064–66. Defendants do not explain how that analysis supports a determination in this case that the initial transfers to the Master Funds were made by, to, or for the benefit of a "commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency," 11 U.S.C. § 546(e), simply because they were made to Goldman Sachs. Instead, Defendants offer only the conclusory statement that Goldman Sachs is "clearly covered by section 546(e)." Therefore, the Court finds Defendants failed to sufficiently develop their argument on this issue and the alleged application of the safe harbor provision to the Trustee's actual fraud claims.

defense to a claim brought by a trustee under § 550. But here, neither the initial transferees, nor the subsequent ones are immune because the claims at issue involve actual fraud.

Accordingly, the Court rejects Defendants' argument that nearly all of the Trustee's claims are barred by section 546(e).

## V.    Prejudgment Interest

The Trustee argues that the Court should award him prejudgment interest at 10 percent per annum. Pl.'s Opening Trial Br. 67–69. The Trustee contends that although Minn. Stat. § 549.09 does not govern the award of prejudgment interest in this case, its 10 percent rate "is a reasonable approximation of an appropriate prejudgment interest rate." *Id.* at 67. The court has discretion to award prejudgment interest when a defendant has withheld damages due to the plaintiff. *Turn Key Gaming Inc. v. Oglala Sioux Tribe*, 313 F.3d 1087, 1093 (8th Cir. 2002). In *Boosalis*, the Eighth Circuit held that federal law governs the award of prejudgment interest for claims arising under the Bankruptcy Code. 974 F.3d at 901–03.

Defendants present no argument that an award of prejudgment interest is unwarranted in this case, nor do they dispute that a 10 percent rate is appropriate. Accordingly, the Court finds that the Trustee is entitled to an award of prejudgment interest at 10 percent per annum. However, the Trustee has not yet specified the date at which prejudgment interest should have begun accruing, nor offered a calculation of the appropriate award of prejudgment interest. Accordingly, the Court cannot calculate a prejudgment interest award at this time. The parties are, therefore, directed to meet and confer to determine whether they can reach an agreement about the date upon which

prejudgment interest should begin accruing. The parties shall advise the Court of the status of those discussions and propose a manner in which the Trustee will file with the Court his calculation of the proper award of prejudgment interest pursuant to this Order.

## VI.    Attorney's Fees

In the Trustee's opening trial brief, the Trustee asks the Court to enter judgment against the Defendants awarding "the Trustee's reasonable attorneys' fees and costs against all Defendants." Pl.'s Opening Trial Br. 69. However, the Court has no briefing before it about the availability of attorney's fees in an avoidance action such as this under either the MUFTA or the Bankruptcy Code, nor does the Court have before it any evidence concerning the reasonableness of any requested fee award. Accordingly, the Court cannot assess the Trustee's request at this time. The parties are directed to meet and confer to discuss the issue of attorney's fees, and based on the substance of those discussions, they shall provide the Court with a joint proposal to govern how the matter should be resolved.

## VII.    Request for Default Judgment

After the parties stipulated to the submission of all remaining issues for resolution by the Court based on stipulated facts and exhibits, briefing, and supporting evidence, the Trustee requested that default be entered as to the Corporate Defendants.[31] In the application for entry of default, the Trustee asserted that seven Delaware Defendants[32] had

---

[31] "Corporate Defendants" refers collectively to all Defendant entities other than the individual *pro se* Defendant Steve Goran Stevanovich.

[32] The "Delaware Defendants" are: Westford Special Situations Fund, L.P.; Westford Asset Management, LLC; Epsilon Global Active Value Fund, L.P.; Epsilon Global Active Value Fund II, L.P.; Epsilon Global Active Value Fund II-B, L.P.; Epsilon Global Active Value Fund II-G, L.P.; and Epsilon Investment Management, LLC.

all been "cancelled" by the Delaware Secretary of State by no later than June 1, 2016; six Cayman Defendants[33] were "struck off" the official Cayman Register of Companies by no later than July 31, 2015; and seven BVI Defendants[34] were "Struck off Dissolved." Given these facts, the Trustee argues that the Corporate Defendants cease to exist under their respective jurisdictions' laws and can neither retain, nor act through counsel, nor otherwise take action in this litigation. The Trustee later narrowed this request, asserting that all Delaware Defendants and all Cayman Defendants, but only one of the BVI Defendants are in default. The Court instructed the Clerk of Court to refrain from entering any Corporate Defendant's default and set a briefing schedule. The Corporate Defendants opposed the Trustee's request, generally arguing that the Trustee is wrong about the legal effect of the allegedly defaulting Defendants' corporate status. The Court held a hearing on the issue on December 12, 2023. Hr'g Tr. (12/12/23) (Doc. 273). The parties recognized that it might be most efficient for the Court to review the Trustee's request for the entry of default of the relevant Corporate Defendants at the same time as it reviewed the merits.

As the Court discussed with counsel at the hearing, the Trustee's request raises complicated legal issues that are more challenging to resolve than may have initially appeared. For example, the briefing asks the Court to apply the law of the Cayman Islands

---

[33] The "Cayman Defendants" are: Westford Special Situations Master Fund, L.P.; Westford Global Asset Management, Ltd.; Epsilon Global Master Fund, L.P.; Epsilon Global Master Fund II, L.P.; Epsilon Global Asset Management, Ltd.; and Epsilon Structured Strategies Master Fund, L.P.

[34] The "BVI Defendants" are: Westford Special Situations Fund, Ltd.; Epsilon Global Active Value Fund, Ltd.; Epsilon Global Active Value Fund I-B Ltd.; Epsilon Global Active Value Fund II-B Ltd.; Epsilon Global Active Value Fund II-G Ltd.; Epsilon Global Active Value Fund III Ltd.; and Stafford Towne, Ltd.

and British Virgin Islands. It also asks the Court to discern the effect, under these foreign laws and the laws of the State of Delaware, of the various ways in which the Corporate Defendants that are at issue ceased to exist as legally recognized entities. Based on the Court's review of the statutory provisions and caselaw cited by the parties and its own independent research, the Court's impression about the complexity of the issues the Trustee has raised remains. Given the Court's consideration of the merits, the review of the voluminous evidence and the legal issues briefed, and the extensive findings of fact and conclusions of law set out in this Order, the Court declines to wade into the interesting and challenging issues presented by the Trustee's request for entry of default.[35]

## VIII.  Order

Based on the foregoing findings of fact and conclusions of law, **IT IS HEREBY ORDERED THAT**:

1. The Trustee has prevailed on his actual fraud claims (Counts 1, 2, 3, and 5) under the Bankruptcy Code and MUFTA. 11 U.S.C. §§ 548(a)(1)(A), 544, 550, 551; Minn. Stat. §§ 513.44(a)(1), 513.47.

---

[35] However, the Court notes that on October 24, 2012, several years before this adversary proceeding was transferred to this Court, the Trustee applied for entry of default against Epsilon Global Active Value Fund II-G Ltd. in the Bankruptcy Court. *In re Petters Co., Inc.*, Adv. No. 10-04396 (GFK), Doc. No. 60 (D. Minn. Bankr. Oct. 24, 2012). The Clerk entered default against EGAV the following day and no request was made in the adversary proceeding in the Bankruptcy Court, nor in this matter, to set aside the entry of default. However, the docket in this matter has not reflected EGAV's default.

2. All fraudulent obligations and transfers are therefore avoided free and clear of any claimed interest of Defendants, and all fraudulent obligations and transfers shall be set aside.

3. The Trustee is entitled to judgment on Counts 1, 2, 3, and 5 against the following Defendants as initial transferees that received fraudulent transfers directly from PL Ltd., in the following amounts:

   a. $87,601,542 against Epsilon Global Master Fund, L.P.;

   b. $120,264,648 against Epsilon Global Master Fund II, L.P.;

   c. $62,533,470 against Westford Special Situations Master Fund, L.P.; and

   d. $4,358,245 against Epsilon Structured Strategies Master Fund, L.P.

4. The Trustee is entitled to judgment on Counts 1, 2, 3, and 5 against the following Defendants as subsequent transferees that received fraudulent transfers in the following amounts:

   a. $59,261,441 against Steve G. Stevanovich;

   b. $3,374,256 against Epsilon Investment Management, LLC;

   c. $11,256,277 against Westford Asset Management, LLC;

   d. $36,269,768 against Epsilon Global Asset Management, Ltd.; and

   e. $8,361,139 against Westford Global Asset Management, Ltd.

5. The Trustee is entitled to nominal judgments on Counts 1, 2, 3, and 5 against the following Defendants, as subsequent transferees that received fraudulent transfers: Epsilon Global Active Value Fund, L.P.; Epsilon Global Active Value Fund, Ltd.; Epsilon Global Active Value Fund II, L.P.; Epsilon Global Active Value Fund II,

Ltd.; Epsilon Global Active Value Fund II-B, L.P.; Epsilon Global Active Value Fund II-G, L.P.; Epsilon Global Active Value Fund II-G Ltd.; Westford Special Situations Fund, L.P.; Westford Special Situations Fund, Ltd.; Epsilon Structured Strategies Fund, L.P.; and Epsilon Structured Strategies Fund Ltd.

6. The Trustee is entitled to an award of prejudgment interest at a rate of 10 percent per annum. The parties shall meet and confer to determine whether they can agree on the date upon which prejudgment interest began to accrue. The parties shall promptly advise the Court of the status of those discussions and propose how the Trustee may file with the Court his calculation of the proper award of prejudgment interest pursuant to this Order.

7. The parties are directed to meet and confer to discuss the issue of attorney's fees, and based on the substance of those discussions, they shall promptly provide the Court with a joint proposal to govern how the matter should be resolved. The parties should also advise the Court whether it should wait to enter a final judgment in this matter until after the issue of attorney's fees is resolved.

Date: November 13, 2024                    *s/Katherine Menendez*
                                           Katherine Menendez
                                           United States District Judge